**In re ORMOND BEACH ASSOCIATES LIMITED PARTNERSHIP, Debtor In Possession.**

**ORMOND BEACH ASSOCIATES LIMITED PARTNERSHIP, Debtor In Possession, Plaintiff,**

v.

**CITATION MORTGAGE, LTD., Citation Mortgage Corporation, and Citation–Ormond in the Pines, Ltd., Defendants.**

**Bankruptcy No. 94–21524.
Adversary Proceeding No. 94–2439.**

United States Bankruptcy Court,
D. Connecticut.

Dec. 30, 1996.

---

Ira H. Goldman, and Maria A. Gulluni, Shipman & Goodwin, Hartford, CT, for Plaintiff–Debtor In Possession.

Dana M. Campbell, and Leighton Aiken, Owens, Clary & Aiken, L.L.P., Dallas, TX, for Plaintiff–Debtor In Possession.

Thomas K. Gallagher, Terrance J. Russell, and Bryan S. Greenberg, Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, FL, Robert A. White, and Robert E. Kaelin, Murtha, Cullina, Richter and Pinney, Hartford, CT, for Defendants.

## MEMORANDUM OF DECISION ON OBJECTIONS TO CLAIMS

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### ISSUE

Ormond Beach Associates Limited Partnership, the plaintiff, and debtor in possession in this Chapter 11 case ("Ormond Beach"), objects, by way of an adversary proceeding it filed on November 7, 1994, to two claims filed in its estate by the defendants Citation Mortgage Corp., Citation Mortgage, Ltd. and Citation–Ormond In The Pines, Ltd. (together, "Citation"). Citation seeks (1) $2,016,472.12 for Ormond Beach's alleged misuse of rental income subject to mortgage and assignment of rents liens, and (2) $13,236,213.14 based upon Ormond Beach's asserted liability for a mortgage deficiency judgment. The hearing on the objections consumed four trial days after which the parties submitted extensive legal memoranda.

### BACKGROUND

On August 11, 1983, RC of A Retirement Living Ltd., Series III ("RC of A"), a Florida limited partnership, signed a $12,000,000 promissory note, *Exh. AD,* secured by a recorded construction mortgage deed on property located in Volusia County, Florida ("the 1983 mortgage") *Exh. AE,* a recorded collateral assignment of leases and rents, *Exh. AF,* and a perfected security agreement covering personal property including "all rents and payments in lieu of rents", *Exh. AJ,* in favor of Freedom Savings and Loan Association ("Freedom"). RC of A thereafter operated a licensed retirement center on the property ("Retirement Center"). Southmark Corporation ("Southmark"), a publicly-owned Georgia corporation, and then a major syndicator in the nursing home, retirement home and health-care industry of limited partnerships as real estate investment vehicles, guaranteed the Freedom loan in May 1985. *Exh. AY.* The general partner of RC of A was Retirement Corporation of America Proper-

ties, Inc., a Florida corporation whose officers were Southmark principals.

RC of A, on or about September 30, 1986, conveyed the Retirement Center to Ormond Beach, a Delaware limited partnership. *Exh. 7.* On the same date, Ormond Beach purchased from a different seller, RC of A HealthCare, Ltd., Series I, an adjacent parcel on which that seller operated a licensed nursing center (the "Nursing Center"). *Id.* Southmark had organized Ormond Beach with Equity Associates Ltd. ("Equity"), a Texas limited partnership, as Ormond Beach's general partner, and had marketed Ormond Beach's limited partnership interests through a nationwide network of dealers/brokers. *See Ormond Beach Associates Limited Partnership Private Placement Memorandum, Exh. 1.* Southmark Investment Group, Inc. became the general partner of Equity on June 22, 1989. *Exh. AV.* Southmark did not hold an ownership interest either in Ormond Beach or in Equity. The management of the Retirement Center and the Nursing Center, both prior to and after the sale (until July 1990), was in the hands of Retirement Corporation of America, Inc. a Southmark subsidiary. *Exh. 1.*

As part consideration for both purchases, Ormond Beach, on September 30, 1986, executed a $17,985,000 promissory note in favor of the two sellers, *Exh. BN,* secured by a wrap-around mortgage on both parcels ("the 1986 mortgage"). *Exh. BO.* The mortgagees in the 1986 mortgage agreed to pay all installments of principal and interest on existing prior mortgages encumbering the two parcels. The parties did not record the deeds of conveyance to Ormond Beach, the wrap-around mortgage or any other documents indicating a transfer had occurred.

At some point prior to July 14, 1989, Southmark became the assignee of the 1986 mortgage, and upon Freedom's insolvency, the Resolution Trust Corporation ("the RTC") became Freedom's receiver. On July 14, 1989, Southmark filed for relief under Chapter 11 of the Bankruptcy Code in Atlanta, Georgia, and its bankruptcy estate was subsequently transferred to a Dallas, Texas bankruptcy court. Neither Ormond Beach nor any of the other limited partnerships

syndicated by Southmark were debtors in the Southmark bankruptcy proceeding. Thompson & Knight, a Dallas, Texas law firm, represented Southmark and Levin, Roth & Kasner, a Houston, Texas law firm represented many of the limited partnerships originally syndicated by Southmark, including Ormond Beach, in their claims against Southmark. Ormond Beach claimed to be a creditor of Southmark and filed two unsecured proofs of claim totaling $3,089,952. *Exhs. 64A, B.*

Immediately following Southmark's bankruptcy filing, Southmark stopped making payments on the 1983 mortgage to the RTC, and Ormond Beach stopped making its payments due Southmark under the 1986 mortgage. On November 17, 1989, the RTC, as Freedom's receiver, filed a "Motion For Relief From Automatic Stay, Request For Adequate Protection and Sequestration and An Accounting of Rents And Proceeds" ("Relief/Stay Motion") against Southmark in its bankruptcy case concerning the 1983 mortgage. *Exh. 9.* Ormond Beach was neither a party to nor served with this motion directly or through its attorneys.

The Relief/Stay Motion recited that Freedom made a mortgage loan in the original principal amount of $12,000,000 to RC of A secured by the Retirement Center and the rents, proceeds and profits thereof; that the loan was in default and the RTC was Freedom's receiver; that Southmark was a guarantor of the loan; that the RTC wished to enforce its contractual rights with respect to its collateral; that the rent collection at the Retirement Center is "performed by Southmark controlled subsidiaries, but which companies are not debtors before this Court"; that "[p]ursuant to Section 363(c)(4) of the Bankruptcy Code, Southmark is required to segregate and account for any cash in its possession, custody or control ... [and] RTC ... does not consent to Southmark's or its related corporations' use of such cash collateral"; that "RTC hereby demands that the rents and proceeds received or to be received from the sale or use of any properties securing the RTC/Freedom Claims be paid directly to RTC...." *Id.* In its prayer for relief, the RTC requested (1) an order modifying

the automatic stay so that the RTC may foreclose; (2) in the alternative, that the court require Southmark to provide adequate protection; (3) that the court issue an order preventing Southmark from using rents and requiring delivery to RTC of rents received by Southmark; (4) that the court order an accounting of cash received and "that Southmark and its designated entities be required to sequester such cash ... which has been or might be received by Southmark's estate." *Id.*

The Texas bankruptcy court, on February 16, 1990, entered an agreed order jointly submitted by the Southmark and RTC attorneys on the Relief/Stay Motion. *Exh. 10.* This order provided that Southmark, by January 29, 1990, shall establish an escrow account for all net operating income it received from the Retirement Center for the period starting July 14, 1989 *"provided, however,* that the entity which is the owner of the Collateral (the "Property Owner") shall be permitted to maintain a cash balance (the "Agreed Amount") sufficient to pay all anticipated operating expenses of the Collateral and any amounts owed to any party with a claim secured by a lien on the Properties (the "Senior Lienholders") or to the RTC" (emphasis in original); that Southmark reserved the right to contend that the monies in the escrow account are not the cash collateral of the RTC; that the order be an interim order providing adequate protection; and that the order "is not to be construed as a consent by the RTC that this Court has jurisdiction over [Southmark subsidiaries and affiliated corporations] and any claims the RTC may have with respect to such or other non-debtor subsidiary or affiliated corporations of the Debtor." *Id.*

Retirement Corporation of America, Inc. as Ormond Beach's then manager, apparently sent a total of $29,000 to a Southmark escrow account created in its bankruptcy case [1], but Ormond Beach otherwise continued to withhold mortgage payments to Southmark. *Exh. EN.* On July 5, 1990, the

Texas bankruptcy court entered a supplemental agreed order, submitted by the RTC and Southmark, providing that the automatic stay imposed by 11 U.S.C. § 362 be terminated to permit the RTC to foreclose the 1983 mortgage and that "any deficiency resulting from a foreclosure ... will be addressed by separate order of this Court." *Exh. 11.*

In the meantime, a Texas state court approved an agreed judgment on July 14, 1990 in a proxy-contest proceeding involving 34 Southmark-sponsored limited partnerships, including Ormond Beach. *Exh. 2.* The judgment provided for the following entities to be named additional general partners in each of the 34 limited partnerships: Limited Partner Investor Monitoring Committee, Inc. ("LPIMC"), a Connecticut corporation, John W. Galston, Eugene H. Rosen, and Bruce Weinstein. *Id.* The judgment further provided that LPIMC would be the managing general partner responsible, at stated fees, for the day-to-day operation of each limited partnership. *Id.* The judgment established March 27, 1990 as the effective date of an amendment to Ormond Beach's partnership agreement to accomplish the foregoing. *Id.*

On July 23, 1990, the Texas bankruptcy court entered an order confirming Southmark's "Fourth Amended and Restated Plan of Reorganization, As Modified." *Exh. 14.* The confirmation order provided, *inter alia,* that "cash and non-cash distributions to" the RTC as Freedom's receiver would be placed in a separate escrow account until an order allowing RTC/Freedom's claim was entered. *Id.* at 31. On September 6, 1990, the RTC and Southmark filed a joint motion for approval of the RTC/Freedom proof of claim. Southmark and the RTC had agreed that RTC/Freedom have an allowed unsecured claim of $4,985,490, after deducting a stipulated amount for the fair market value of the Retirement Center.[2] The Texas bankruptcy court, on November 7, 1990, approved the compromise. *Exh. 13.*

---

**1.** The record in this proceeding does not disclose who eventually received the $29,000. An RTC attorney testified that the RTC never received any monies from the escrow account. *Exh. KM* at 92–93.

**2.** The RTC apparently received no distribution on this claim.

The 34 limited partnerships and Southmark executed an agreement, dated September 13, 1990, and approved by the Texas bankruptcy court, which provided that all encumbrances held by Southmark on any of the properties owned by the 34 limited partnerships were released as satisfied, thereby eliminating the 1986 mortgage. *Exh. 8.* The Agreement also provided that Equity's interest in any of these limited partnerships would be assigned to LPIMC. *Id.* Equity had executed and delivered such an assignment to LPIMC on July 11, 1990. *Exh. 3.*

In early August 1990, LPIMC's officers, having replaced Retirement Corporation of America, Inc. in management of Ormond Beach, started discussions with RTC's officials and agents in a mutual attempt to restructure the 1983 mortgage. Jesse Austin, Esq. ("Austin"), RTC's counsel, in a letter dated August 2, 1990 to LPIMC's counsel, noted that foreclosure "may not be in our respective clients' best interests" and the "negotiation process" to restructure the loan should proceed "as soon as possible." *Exh. 15.* LPIMC sent to the RTC five-year financial projections, background material on the individuals managing the Retirement Center, and after noting $200,000 to $300,000 was needed for property improvements, suggested a restructured, five-year, interest-only mortgage in the amount of $7,000,000. *Exh. 16.* Although LPIMC continued to send additional material requested by the RTC throughout 1991, on January 9, 1992, the RTC advised Ormond Beach that on that date the 1983 mortgage and related documents had been sold to the defendant, Citation Mortgage, Ltd., a Nevada limited partnership with an office in Salem, Oregon, and that "all future ... payments" under the mortgage should be sent to that buyer. *Exh. 26.*

Holiday Retirement Corporation ("Holiday"), a management company currently managing 168 retirement homes, had formed Citation Mortgage, Ltd. in late 1991 for the sole purpose of purchasing 23 mortgages, including the 1983 mortgage, from the RTC. The defendant, Citation Mortgage Corp., is the corporate general partner of Citation Mortgage, Ltd. *Exh. HQ.* Holiday/Citation

made their decision to purchase the 1983 mortgage after a due diligence examination of the RTC portfolio. They had, at the time of purchase, no knowledge of the RTC Relief/Stay Motion in the Southmark bankruptcy case. The RTC, in its papers assigning its interest in the 1983 mortgage to Citation, assigned as well "all ... claims ... escrow accounts, ... demands, causes of action and any other collateral that Assignor may have in and to or with respect to the [1983 mortgage loan]." *Exh. GZ.*

Eugene H. Rosen, as president of LPIMC, the sole general partner of Ormond Beach, on December 13, 1991, recorded an "Affidavit of Title", dated November 15, 1991, on the Volusia County, Florida Official Public Records. *Exh. GT.* The affidavit averred that Ormond Beach and LPIMC "have just learned" that the sellers' deeds conveying title to the Retirement Center and the Nursing Center to Ormond Beach had not been "recorded on the Official Public Records of Volusia County, Florida despite ... due tender of the purchase price"; that copies of such deeds were attached as exhibits to the affidavit; that the purpose of the affidavit was to put the world on notice that Ormond Beach was the owner of these properties; and that when located Ormond Beach "intends to record same." *Id.*

Citation's attorneys, on May 14, 1992, sent a letter addressed to RC of A, and copied to Ormond Beach and LPIMC, stating that "any and all work-out negotiations with respect to the [1983 mortgage] have been terminated by Citation," that the "Note and Mortgage have been in default," and that demand was made for $17,803,365.29 as the "total due as of March 4, 1992." *Exh. 27.* Citation, on June 11, 1992, by letter to Ormond Beach, made a demand "for all Rents from [the Retirement Center] pursuant to Fla.Stats. § 697.07." *Exh. 28.*

Citation, on June 26, 1992, filed a complaint against Ormond Beach and others in a Florida state court seeking, *inter alia,* a foreclosure of the 1983 mortgage, a foreclosure of the collateral assignment of leases and rents, and the entry of a deficiency judgment. *Exh. HQ.* The Florida court entered a sequestration order on July 24, 1992,

approving a stipulation of Citation and Ormond Beach that, starting with June 1992 and continuing until further order of the court, Ormond Beach would deposit into the registry of the court all net operating income of the Retirement Center. *Exh. 31A.* The Florida court appointed a receiver of rents on August 11, 1992. *Exh. IG.* Ormond Beach, in accordance with the sequestration order, deposited a total of $150,045.20 into the court's registry. *Exhs. 31A, B, C.*

In the course of examining Ormond Beach's financial records pursuant to the July 24, 1992 rent sequestration order, Citation's agents noted that Ormond Beach, during 1990 and 1991, had made cash distributions to its limited partners. Norman L. Brenden, the treasurer of Citation Mortgage Corp., testified that upon learning of these transfers the Citation principals "just felt that that was not right." *Transcript 7/24/96* at 39.

Citation, on August 19, 1992, sent an additional notice to Ormond Beach making demand for an accounting of all net rents received since July 1989 and a turnover of such rents as called for by the sequestration order. *Exh. IK.* On October 16, 1992, Citation served a motion to amend the July 24, 1992 rent sequestration order to require Ormond Beach to account for net rents since July 1989. The state court, on July 16, 1993, granted the motion for the period starting November 17, 1989, concluding that "Southmark Corporation, on November 17, 1989, was Ormond Beach's agent for service for notice/receipt of all documents served/filed in the Southmark Corporation Bankruptcy case...." *Exh. 42.* The court ordered that "[p]ursuant to Fla.Stat. § 697.07, as amended, the Defendants, Ormond Beach and LPIMC," render a written accounting for "the receipt and use of the accumulated net operating income for the period from November 17, 1989 through August 11, 1992, the date of appointment of the Receiver herein." *Id.*

Ormond Beach timely appealed this order. The District Court of Appeals of the State of Florida Fifth District on March 4, 1994 affirmed the order, but "not on the basis articulated in the lower court's order." *Exh. 43.* In the interim, the state court, on January 6, 1993, entered a foreclosure judgment finding the debt due Citation to be $18,985,648.88, ordering the clerk of court to conduct a public sale of the Retirement Center on February 5, 1993, and reserving jurisdiction to enter a deficiency judgment and to decide Citation's entitlement to rents between July 1989 and June 11, 1992. *Exh. JC.* The parties thereafter stipulated, that taking into account various credits including the successful high bid of $6,610,000 by Citation's affiliate [3] at the public sale, the deficiency, as of November 5, 1993, equalled $13,236,213.14. *Exh. LH.* The parties further stipulated that Ormond Beach's "liability, if any, for the said deficiency shall be determined at trial." *Id.*

Ormond Beach, as the owner-operator of the Nursing Center, filed for relief under Chapter 11 in this court on April 26, 1994. Citation filed proofs of claim asserting its rent entitlement and mortgage deficiency claims. *Exhs. 79A, B, C.* Citation filed a motion for relief from stay on December 1, 1994, and the court, on December 22, 1994, entered an order modifying the provisions of Bankruptcy Code § 362 to permit Citation to continue liquidating its claims pending in the Florida state court for the November 17, 1989 to August 11, 1992 rents and for a deficiency judgment. The Florida state court, on March 7, 1995 entered an interlocutory order finding the net operating income for the stated period to be $994,748.

Citation filed a motion in this court to expand the matters to be heard by the Florida state court. Ormond Beach objected to this motion and countered with a motion to vacate the December 22, 1994 order which had modified the automatic stay. On December 13, 1995, the court concluded that it had "improvidently entered" the December 22, 1994 order, vacated it and ruled that "Citation's claims will be heard in the bankruptcy court." *In re Ormond Beach Associates*

---

**3.** The defendant, Citation–Ormond in the Pines, Ltd., is the present owner of the Retirement Center.

*Limited Partnership,* No. 94–21524, slip op. (Bankr.D.Conn. December 13, 1995). Subsequently, in a ruling on Citation's motion *in limine* to determine whether any findings of fact by the Florida state court may be relitigated in the bankruptcy court, the court concluded that the Florida findings were interlocutory, not final, and "not to be given preclusive effect in this court." *In re Ormond Beach Associates Limited Partnership,* No. 94–21524, slip. op. (Bankr.D.Conn. July 12, 1996).

At this point, the parties proceeded to trial. Additional facts will be added as necessary to address the parties' contentions.

## DISCUSSION

### I. The Rent Entitlement Claim

■ Citation contends that any one of the following three Florida statutes provides a basis for its recovery of damages equal to the net rents received by Ormond Beach between November 17, 1989 and August 11, 1992: Fla.Stat. §§ 697.07 *Assignment of Rents;* 818.01 *Disposing of Personal Property Under Lien Or Subject To Conditional Sale;* and 726.105 *Transfers Fraudulent As To Present And Future Creditors.* Although Ormond Beach presents separate defenses to a finding of its liability under any of these statutes, it initially argues that Citation has no standing to assert any claim based upon Ormond Beach's actions preceding Citation's purchase of the 1983 mortgage. Ormond Beach cites *Ginsberg v. Lennar Florida Holdings, Inc.,* 645 So.2d 490, 496 (Fla. 3d DCA 1994) for the proposition that absent an express assignment of causes of action, an assignee of a note and mortgage from the RTC may not pursue causes of action for interference with collateral which allegedly accrued prior to its ownership of the note and mortgage. Ormond Beach argues that the court should, in effect, ignore *Exhibit GZ,* the January 9, 1992 RTC assignment to Citation, which specifically mentions "causes of actions", because, unlike the Assignment of Non–Affiliate Mortgage Loan, *Exhibit GW, Exhibit GZ,* was never recorded and Ormond Beach claims Citation revealed the existence of this assignment for the first time at trial. Inasmuch as Ormond Beach made no objection to the admissibility of *Exhibit GZ,* this aspect of Ormond Beach's argument on standing lacks merit and fails.

### A. Florida Statute § 697.07 [4]

The 1983 mortgage included as collateral "all rents, issues [and] profits thereof", *Exh.*

---

4. 697.07. *Assignment of rents*

(1) A mortgage or separate instrument may provide for an assignment of rents of real property or any interest therein as security for repayment of an indebtedness.

(2) If such an assignment is made, the mortgagee shall hold a lien on the rents, and the lien created by the assignment shall be perfected and effective against third parties upon recordation of the mortgage or separate instrument in the public records of the county in which the real property is located, according to law.

(3) Unless otherwise agreed to in writing by the mortgagee and mortgagor, the assignment of rents shall be enforceable upon the mortgagor's default and written demand for the rents made by the mortgagee to the mortgagor, whereupon the mortgagor shall turn over all rents in the possession of the mortgagor at the time of the written demand or collected thereafter (the "collected rents") to the mortgagee less payment of any expenses authorized by the mortgagee in writing.

(4) Upon application by the mortgagee or mortgagor, in a foreclosure action, and notwithstanding any asserted defenses or counterclaims of the mortgagor, a court of competent jurisdiction, pending final adjudication of any action, may require the mortgagor to deposit the collected rents into the registry of the court, or in such other depository as the court may designate. However, the court may authorize the use of the collected rents, before deposit into the registry of the court or other depository, to:

(a) Pay the reasonable expenses solely to protect, preserve, and operate the real property, including, without limitation, real estate taxes and insurance;

(b) Escrow sums required by the mortgagor or separate assignment-of-rents instrument; and

(c) Make payments to the mortgagee.

The court shall require the mortgagor to account to the court and the mortgagee for the receipt and use of the collected rents and may also impose other conditions on the mortgagor's use of the collected rents.

(5) Nothing herein shall preclude the court from granting any other appropriate relief regarding the collected rents pending, adjudication of the action. The undisbursed collected rents remaining in the possession of the mortgagor or in the registry of the court, or in such

*AE,* and the collateral assignment of rents and leases assigns the "entire interest and position in all leases, reservation agreements, residency agreements, monthly maintenance or care agreements and rental arrangements ... now existing or hereafter made or existing...." *Exh. AF.* Section 697.07(3) provides that "the assignment of rents shall be enforceable upon the mortgagor's default and written demand for the rents made by the mortgagee to the mortgagor...." Citation contends that the filing, on November 17, 1989, of the Relief/Stay Motion against Southmark constitutes the written demand to Ormond Beach because Southmark was acting as Ormond Beach's general partner and thus as its agent.

### 1. *Was Southmark Acting as Ormond Beach's General Partner and Agent?*

Citation, in large part, relies on the symbiotic relationship revealed in this record among Southmark, Equity, RC of A, Retirement Corporation of America Properties, Inc., Retirement Corporation of America, Inc., Southmark Investment Corp., Inc., Ormond Beach and other Southmark subsidiaries to establish agency. Citation refers to the testimony of Bruce A. Schnitz ("Schnitz"), an executive vice president of Southmark and the president of Southmark Investment Corp., Inc., the 1989 corporate general partner of Equity, Ormond Beach's original general partner, who stated that in his opinion there was no difference between giving notice to Southmark or giving notice to a Southmark-sponsored limited partnership. "As long as notice got to me, and it had legal impact upon the partnership, then we would respond as best we could to that

notice." *Transcript 7/24/96* at 175. Citation further contends that based upon the testimony of Austin, the RTC attorney who prepared and filed the Relief/Stay Motion, Austin "understood Southmark was acting as agent for [Ormond Beach] and filed the [Relief/Stay Motion] to protect the Mortgagee's interest in rents pursuant to Florida Statute § 697.07...." *Citation Opening Memorandum* at 7.

Ormond Beach responds that the Relief/Stay Motion cannot constitute an effective demand because it was contained in a pleading; that Southmark was not the agent of Ormond Beach; that the Relief/Stay Motion was directed solely against Southmark; and that the Relief/Stay Motion purported to deal only with cash collateral in Southmark's possession, custody or control. *Ormond Beach's Post–Trial Brief* at 34–39.

Citation concedes that Ormond Beach was not a debtor in the Southmark bankruptcy case and that the rents earned from the Retirement Center were not part of the Southmark estate. *Citation Opening Memorandum* at 7–8 n. 3. It is clear that one of the reasons RTC needed relief from the automatic stay in the Southmark bankruptcy case in order to commence a foreclosure action of the 1983 mortgage was the existence of the 1986 mortgage held by Southmark. A foreclosure of the 1983 mortgage could extinguish the 1986 mortgage, and the law is settled that the automatic stay protects a debtor's inferior security interest. *See, e.g., Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 53 (2nd Cir.1976).

The RTC did not attempt to have the Texas bankruptcy court, for cause, disre-

other depository as ordered by the court, shall be disbursed at the conclusion of the action in accordance with the court's final judgment or decree.

(6) The court shall expedite the hearing on the application by the mortgagee or mortgagor to enforce its assignment of rents. The procedures authorized by this statute are in addition to any other rights or remedies of the mortgagee or mortgagor under the mortgage, separate assignment-of-rents instrument, promissory note, at law, or in equity.

(7) Nothing herein shall alter the lien priorities, rights, or interests among mortgagees or other lienholders or alter the rights of the

mortgagee under the mortgage, separate assignment-of-rents instrument, at law or in equity, concerning rents collected before the written demand by the mortgagee. A mortgagee's enforcement of its assignments of rents under this statute shall not operate to transfer title to any rents not received by the mortgagee.

(8) Any moneys received by the mortgagee pursuant to this statute shall be applied by the mortgagee in accordance with the mortgage, separate assignment-of-rents instrument, or promissory note, and the mortgagee shall account to the mortgagor for such application. Fla.Stat. § 697.07 (1993).

gard the separate entities of Southmark and Ormond Beach. Austin testified that the purpose of the Relief/Stay Motion was to prevent any excess cash flow from the Retirement Center "from being distributed to Southmark for use in its bankruptcy case"; that he dealt only with Thompson & Knight as Southmark's attorneys and was unaware that Levin, Roth & Kasner represented Ormond Beach and had filed proofs of claim on Ormond Beach's behalf; and that the RTC did not bother with any attempted enforcement of the February 16, 1990 order on the Relief/Stay Motion because Southmark did not file accountings and "we were closing in on the confirmation of Southmark's plan and ultimate resolution." *Exh. KM* at 14, 36, 58, 77.

Peter J. Riley, Esq., a Thompson & Knight attorney, testified that Southmark's interests in the Texas bankruptcy proceeding were adverse to the interests of the partnerships syndicated by Southmark; that he was aware that many of the partnerships were represented by Levin, Roth & Kasner; and that because of a perceived conflict of interest between Southmark and the partnerships, Thompson & Knight never represented the partnerships in connection with the Southmark bankruptcy proceedings. *Transcript 8/1/96* at 188–89. He also stated that, in his opinion, upon the entry on July 5, 1990 by the Texas bankruptcy court of the order permitting the RTC to foreclose the 1983 mortgage, *Exh. 11*, "Southmark had no further obligation to make any deposit under the escrow account." *Id.* at 192.

The order issued by the Southmark bankruptcy court on the Relief/Stay Motion explicitly stated that RTC did not consent to any claim that the Southmark bankruptcy court had "jurisdiction over ... [Southmark] subsidiary or affiliated corporations." *Exh.*

10. From November 17, 1989 to January 9, 1992, when the RTC sold the 1983 mortgage to Citation, the RTC was in frequent contact with Ormond Beach, and after LPIMC replaced Retirement Corporation of America, Inc. on July 1, 1990, never once demanded the rents from LPIMC. A memorandum dated July 22, 1990, signed by various RTC department officials, to the RTC Senior Credit Review Committee stated that "Southmark and the bankruptcy courts have now agreed to abandon this asset and allow RTC to foreclose on its portion of this project. The project is substantially overfinanced ... [and] it seems that foreclosure and a petition for a managing receiver are the appropriate actions." *Exh. 86.* There is no evidence that any officer of LPIMC was aware of the Relief/Stay Order while the RTC was the holder of the 1983 mortgage. When the RTC sold the 1983 mortgage to Citation, it did not represent, and Citation did not believe, that Citation was acquiring the right to collect over two prior years of net rents.

The testimony of Schnitz does not have the significance Citation asserts. During his discussion on how Southmark generally dealt with the approximate 300 limited partnerships Southmark had sponsored,[5] Schnitz gave the following answers to questions posed by Citation's counsel:

Q. Did you consider yourself to be an agent of the limited partnerships and subsidiaries?

A. I did not consider myself an agent for anyone. I considered myself an employee of Southmark. I considered Southmark to have a specific role, responsibility and set of authorities in relation to those partnerships, and it was my job, as an executive officer of Southmark, to discharge those

**5.** "If you can imagine having a small company with a half million stockholders and 300 different businesses scattered throughout 35 different states, all of which were required, for the most part, to operate under some set of laws related to securities; and each of these companies owned for its own account real estate assets and these real estate assets had to be run as individual businesses on a day-to-day basis, and some of these were nursing homes and some were hotels and some were office buildings and some were

shopping malls and some were strip centers and some were apartment buildings, some were mini warehouses. So you have all of these various and sundry businesses that need to be run every day, day in and day out, and each business has its own financial statement, and each business has its own cash flow, each business has its own capital problems, each business has its own balance sheet."

*Exh. KK* at 20.

duties that Southmark, through its affiliates, had to those partnerships.

Q. Did Southmark act as an agent for those subsidiaries and authorities [sic]?

A. This is my perception, but I believe I just answered that question. As an executive officer of Southmark, representing Southmark, to the extent my actions, in my mind, were not as an agent of the partnerships, then you must conclude that Southmark was not acting as an agent for the partnerships. *Exh. KK* at 40–41.

Schnitz, during his testimony, incorrectly assumed that Equity, a limited partnership and Ormond Beach's original general partner, was a corporation owned by Southmark. *Id.* at 9.

■ The court finds that the RTC, aware that it needed relief from stay to take any action based on the 1983 mortgage and related documents, could not, and did not, intend the Relief/Stay Motion to be a demand on Ormond Beach for the rents using Southmark as Ormond Beach's agent. During the pendency of the Southmark bankruptcy case, Southmark could not adequately represent the interests of Ormond Beach as its agent because each were asserting claims against the other. Even if the officers of Ormond Beach's then general partner had actual notice of the Relief/Stay Motion, that does not satisfy a statutory requirement of written demand on Ormond Beach.

The court concludes that the RTC, if it presently owned the 1983 mortgage, would be estopped to make a claim for the post-November 17, 1989 rents in a foreclosure action by its failure to assert any right to rents from November 17, 1989 to the date it transferred the mortgage to Citation, by its failure to ever advise LPIMC of its claim to rents while it negotiated with LPIMC for over a year and a half, and by its failure to establish in the Relief/Stay Motion that Southmark was the agent of Ormond Beach. Citation cannot be in any better position than the RTC and, indeed, equitable consider-

ations are not in its favor as it seeks to collect on a claim it never understood it was acquiring with the 1983 mortgage.

In sum,[6] the court concludes that the Relief/Stay Motion does not constitute a written demand on Ormond Beach under § 697.07 because neither legal or equitable principals mandate that Southmark be held to be the general partner or the agent of Ormond Beach for such purpose. *Cf. Gould v. Smith (In re Holywell Corporation),* 118 B.R. 876, 879 (S.D.Fla.1990) (Bankruptcy Court had no jurisdiction over property without first finding that the property is part of debtor's estate. Therefore, "bankruptcy courts lack jurisdiction to disburse a partnership's property to a bankrupt partner's creditors when the bankruptcy involved only that partner. . . .").

**2. Ormond Beach's Liability for Net Rents from November 17, 1989**

The court, aware that review of its findings of fact and conclusions of law will be sought,[7] will rule upon Citation's contention that, assuming Southmark were the agent of Ormond Beach, Citation is entitled to damages under § 697.07 for the failure of Ormond Beach to retain the net rents from November 17, 1989. Ormond Beach argues that § 697.07 was originally enacted in 1987, after the execution of the 1983 mortgage and related documents; that the statute is prospective only because it codified a substantive change in Florida common-law rights; and that § 697.07 is inapplicable, accordingly, to mortgages and assignment of rents executed prior to its enactment. *Ormond Beach's Post-Trial Brief* at 32–34.

Alternatively, Ormond Beach contends § 697.07 provides a procedural alternative which permits a mortgagee to seek a court order sequestering rents in lieu of filing a mortgage foreclosure action in order to obtain the appointment of a receiver of rents. Ormond Beach argues that the statute does not alter a mortgagor's common-law right to

---

6. Other arguments presented by the parties have been noted but need not be addressed.

7. This proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B) ("allowance or

disallowance of claims against the estate") which the bankruptcy court may hear and determine subject to appeal.

collect and disburse rents until a court order determines that the mortgagor shall deposit the rents into a court or other depository pending the court's final decree. *Id.* at 28–31.

Citation answers that § 697.07 should be construed to apply retroactively, and that Ormond Beach is liable in damages for all collected net rents not turned over to Citation from November 17, 1989 notwithstanding the lack of a sequestration order until July 24, 1992. *Citation Opening Memorandum* at 25–30.

(a) *Retroactivity of § 697.07*

■ It is well settled that under Florida common law, a pledge of the rents and profits, in addition to the land, as security for a mortgage debt creates a contract lien to secure a debt which can only be made effective and enforceable by the appointment of a receiver or the taking of possession by the mortgagee. *Carolina Portland Cement Co. v. Baumgartner*, 99 Fla. 987, 995–6, 128 So. 241, 245 (Fla.1930) ("as long as the mortgagor continues in possession, he can collect the rents"); *White v. Anthony Inv. Co.*, 119 Fla. 108. 109, 160 So. 881, 882 (Fla.1935) ("the general rule is that [a] mortgagee becomes entitled to receive such rents ... from the time he takes possession of the property either by the consent of the owner or through the appointment of a receiver in foreclosure proceedings.... [H]e is not only entitled to the rents which accrue after that time, but he is entitled to such rents as have accrued prior to the appointment of a receiver and after default but which have not been paid.").

■ Although there is a split of authority among the Florida lower and intermediate courts and federal trial courts on the question of whether § 697.07 applies retroactively, the court believes the Florida Supreme Court would conclude that the statute applies retroactively for the reasons enunciated in the following decisions. *Ginsberg*, 645 So.2d at 496–7 (court held that § 697.07 should be applied retroactively; the statute

is remedial and procedural in nature; the statute "does not purport to cause the transfer of an ownership interest in rents, [but] merely ... establish[es] procedures designed to give effect to the parties' rent assignment"; it was the intent of the legislature that statute was to be applied retroactively since in 1993 Legislature amended statute "in part, in response to several cases which held the statute not to be applicable retroactively") (internal citations and quotation marks omitted); *Ormond Beach Associates Limited Partnership and LPIMC, Inc. v. Citation Mortgage, Ltd.*, 634 So.2d 1091, 1092 (Fla. 5th DCA 1994) (statute applies to mortgage that predated the enactment of the statute and to "rents collected before enactment of the statute but still held by the mortgagor at the time application for relief was sought under the statute. If the legislature is empowered to enact legislation that interferes with the ownership rights of the mortgagor to the extent of requiring sequestration of rents subject to the lien, it is immaterial when the rents were collected so long as they are in the hands of the mortgagor and are covered by the assignment"); *Oakbrooke Associates, Ltd. v. Insurance Commissioner of California*, 581 So.2d 943, 946 (Fla. 5th DCA 1991) (Section 697.07 may be retroactively applied "because the statute does not operate to impair rights vested before enactment, create new obligations for the parties in a preexisting legal relationship or impose new penalties on conduct which occurred before enactment"); *Nassau Square Associates, Ltd. v. Insurance Commissioner of California*, 579 So.2d 259, 260 (Fla. 4th DCA 1991) (statute did not work substantive change in existing law and can be applied retroactively to assignments executed before statute's effective date).

Ormond Beach relies upon several bankruptcy court decisions which hold that the statute alters substantive rights under the common law and does not explicitly authorize retroactive application. These conclusions are largely based on language which is no longer contained within the statute as amended in 1993 [8] and the holdings are

---

8. The prior statute contained the following language which was deleted by the 1993 amendment: "such assignment [of rents] shall be absolute upon the mortgagor's default, becoming

thereby unpersuasive.[9]

### (b) Necessity of Court Sequestration Order to Support Liability for Dissipation of Net Rents

Citation bases its contention for damages for Ormond Beach's use of the net rents following demand on the "unambiguous language of the statute." *Citation Opening Memorandum* at 25. Citation concurs with Ormond Beach that judicial intervention had to be sought under Florida common law for enforcement of a mortgagee's rights, but argues that the statute changed the enforcement procedure to substitute written demand "without the need for foreclosure proceedings", and that upon demand, it was entitled to "immediate possession of rents in the possession of the mortgagor at the time of written demand or collected thereafter." *Id.* at 28–29. Citation reads *Nassau Square Associates,* and *Oakbrooke Associates, supra,* as in support of this construction.

■ The court concludes that the Florida Supreme Court would not construe § 697.07 to support a mortgagee's claim for damages when, after the mortgagee made a written demand for rents, the mortgagor refused to comply, and the mortgagee delayed for two and one-half years before seeking a court sequestration order. Although there are no rulings directly on point, the court concurs with the dicta contained in those authorities discussed in section I.A.2.(a), *supra,* rather than the argument offered by Citation. *See Ginsberg,* 645 So.2d at 497 (Assignment of rents creates a lien on rents and the mortgagee will have right to foreclose that lien and collect rents without the necessity of foreclosing the underlying mortgage. Written demand does not give title to the rents, but "merely gives the right to bring an action

operative upon written demand made by the mortgagee." Fla.Stat. § 697.07 (1987).

**9.** *In re Ameriswiss Associates,* 148 B.R. 349, 352–53 (Bankr.S.D.Fla.1992); *In re Westport–Sandpiper Associates Limited Partnership,* 116 B.R. 355, 357 n. 2 (Bankr.D.Conn.1990); *In re 163rd Street Mini Storage, Inc.,* 113 B.R. 87, 88–90 (Bankr. S.D.Fla.1990); *In re Franklin Pembroke Venture II,* 105 B.R. 276, 279–80 (Bankr.E.D.Pa.1989); *In re Camelot Assoc. Ltd. Partnership,* 102 B.R. 161, 164–6 (Bankr.D.Minn.1989).

to foreclose on that lien upon refusal of the mortgagee [sic] to pay over the rents."); *Oakbrooke Associates, Ltd.,* 581 So.2d at 946 (The "statute was enacted in order to facilitate enforcement of assignment-of-rents clauses rather than to create a substantive, absolute right to receive rents upon demand ... [T]he language in the statute which contemplates further judicial proceedings to determine the mortgagee's dispositive right to the rents would be meaningless if this latter interpretation were adopted."); *Nassau Square Associates, Ltd.,* 579 So.2d at 261 (same); *In re One Fourth Street North, Ltd.,* 103 B.R. 320 (Bankr.M.D.Fla.1989) (statute, after mortgagee's demand, contemplates further judicial proceedings; "[i]f the mortgagee had acquired an ownership right in the rents upon making written demand, there would be no further need of any proceeding or an adjudication of the mortgagee's right to the rents...").

■ The court adopts the interpretation that the statute merely codifies the procedure a mortgagee must follow to enforce an assignment of rents under Florida law. Upon default, written demand upon the mortgagor by the mortgagee entitles the mortgagee to seek an order sequestering the rents pending an adjudication of the mortgagee's right to the rents in a rent foreclosure action. Consistent with the common law of Florida, the mortgagor may lawfully use the rents under the statute after default and demand until an order of sequestration places the rents within the control of the court.

### B. Florida Statute § 818.01 [10]

■ The Florida Supreme Court has described the purpose of § 818.01 as follows:

**10.** 818.01. *Disposing of personal property under lien or subject to conditional sale.*

(1) Whoever shall pledge, mortgage, sell, or otherwise dispose of any personal property to him belonging, or which shall be in his possession, and which shall be subject to any written lien, or which shall be subject to any statutory lien, whether written or not, or which shall be the subject of any written conditional sale contract under which the title is retained by the vendor, without the written consent of the person holding such lien, or retaining such title;

"Chapter 818, Florida Statutes (1977) governs the sale of mortgaged personal property and makes it a crime to dispose of personal property encumbered by a lien without the written consent of the lienholder." *Flanigan's·Enterprises, Inc. v. Barnett Bank of Naples,* 639 So.2d 617, 618 (Fla.1994).

Citation initially asserted that Ormond Beach is liable in damages for violation of § 818.01 in that following the asserted demand made by the RTC on November 17, 1989, Ormond Beach accumulated the net rents, commingled them with other funds, made distributions to its partners and utilized the rents for payment of property improvements to the Nursing Center and for payment of its attorney's fees. *Citation Opening Memorandum* at 35. Citation contended that "[b]ased upon the clear language of the Statute", it is entitled to damages equal "to the net rental income that accrued and was ... collected from November 17, 1989 through June 30, 1992." *Id.* at 38. In its reply brief, Citation modified its argument and contended that the statute does not require notice of demand and that Ormond Beach's "act of commingling which placed the funds outside the reach of Citation's lien ... is sufficient to trigger enforcement of the statute." *Citation Reply Brief* at 21.

Ormond Beach replies that no Florida case law exists in which this statute, in effect since 1893, has been applied to a party executing an assignment of rents; that Fla.Stat. § 679.104(10) (The Uniform Commercial Code), which governs security interests in personal property, excludes rents; that Ormond Beach was not aware of any demand for the rents so that a violation of the statute cannot be established; and that there is no evidence to support a claim that Ormond Beach made any transfers with intent to defeat, hinder or delay the enforcement of the lien. *Ormond Beach's Post–Trial Brief* at 41–55.

### 1. Section 818.01 Does Not Apply to Rents

Although § 818.01 is nominally a penal statute providing for criminal penalties, the Florida District Court of Appeals, Third District, has ruled that it may give rise to a civil cause of action, *Rosenberg v. Ryder Leasing, Inc.,* 168 So.2d 678–9 (Fla. 3d DCA 1964); that the provisions of the statute may be imposed upon a successor in interest to the original debtor, *Littman v. Commercial Bank & Trust Co.,* 425 So.2d 636, 639 (Fla. 3d DCA 1983); and the Florida Supreme Court has held that "[t]he language of the statute does not require proof of the specific intent to defeat the lien created thereby....", *Mills v. State,* 58 Fla. 74, 51 So. 278, 282 (Fla.1910).

As previously noted, under Florida common law, a pledge of the rents and profits as security for a mortgage debt creates a contract lien which can only be made effective and enforceable by the mortgagee taking possession or by the judicial appointment of a receiver at the request of the mortgagee, and until such time the mortgagor may collect and utilize the rents. *See* cases cited in section I.A.2.(a), *supra.* The 1983 assignment of rents here involved is not an absolute assignment, but permits the assignor to use and dispose of rents "until a default shall occur." *Exh. AF.*

■ The court concludes that the Florida Supreme Court would not apply § 818.01 to the circumstances of this proceeding. Citation's contention that § 818.01 is applicable to collected rents subject to an assignment of

---

and whoever shall remove or cause to be removed beyond the limits of the county where such lien was created or such conditional sale contract was entered into, any such property, without the consent aforesaid, or shall hide, conceal or transfer, such property with intent to defeat, hinder or delay the enforcement of such lien, or the recovery of such property by the vendor, shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

(2) It shall be prima facie evidence of concealing, selling, or disposing of such personal property whenever the person owning the property at the time the lien was created, or who bought the same under such retained title contract, fails or refuses to produce such property for inspection within the county where the lien was created, or the property delivered, upon demand of the person having such lien, or retaining such title, after the debt secured by such lien has become enforceable, or the vendee has substantially defaulted in the performance of such retained title contract.

Florida Statute § 818.01 (1971).

rents without the necessity of a demand is simply unconvincing. The statute makes no reference to rents. No Florida court, in the one hundred years of the statute's existence, has ever been called upon to so rule, and the following explanation of the statute by the Florida Supreme Court in *State v. Dowling*, 92 Fla. 848, 110 So. 522, 524 (Fla.1926), undoubtedly supplies the reason why: "The act, in other words, tends to stabilize the sale and barter in personal property under lien or written conditional sale contract, and to fix its situs within the knowledge of the lienee or vendor while so burdened. It deals solely with property that is in its very nature perishable, is subject to rapid depreciation in value, is easily secluded, and is readily transported from place to place."

Ormond Beach represents that a Florida trial court, in an action filed by Citation against present and former general partners of Ormond Beach, has dismissed with prejudice Citation's claims based upon § 818.01. The court declines to rule that the Florida Supreme Court would conclude that personal property under § 818.01 includes collected rents and, accordingly, decides that Citation is not entitled under this statute to recovery of net rents collected by Ormond Beach since November 17, 1989 as damages.

### C. *Florida Statute § 726.105* [11]

Section 726.105, Florida's version of the Uniform Fraudulent Transfer Act ("UFTA"), is the third Florida statute which Citation contends independently justifies Citation's rent entitlement claim. "Under the UFTA, any transfer made with 'actual intent to hinder, delay or defraud' any present or future creditor is a fraudulent transfer. § 726.105(1)(a), Fla.Stat. (1993). Because of

the difficulty of proving actual intent, past statutory law, existing case law and the UFTA look to indicia of intent commonly known as 'badges of fraud.' § 726.105(2)." *Amjad Munim, M.D., P.A. v. Azar*, 648 So.2d 145, 152 (Fla. 4th DCA 1994). As this quotation explicates, fraudulent transfer law deals with the *avoidance of transfers* and recovery from *transferees* of either the property transferred or the value thereof. Citation, however, invokes the UFTA not to avoid transfers made by Ormond Beach and thereby to recover property or damages from a transferee, but to establish a monetary liability on Ormond Beach as the transferor. Citation argues that "these funds [net operating rental income] were subject to Citation's lien, [Ormond Beach] was aware of Citation's claim to those monies and [Ormond Beach] did not receive consideration in return for those transfers. [Ormond Beach's] improper transfer of these monies, therefore, constituted a fraudulent transfer in violation of § 726.105(2) Fla.Stat." *Citation Opening Memorandum* at 38–9. Citation further asserts not only that the *Munim* ruling so holds, but that "numerous" bankruptcy cases "have applied the UFTA to award damages to a creditor in bankruptcy against the debtor." *Id.* at 41, citing *Freehling v. Suerich Enterprises, Inc. (In re Flanzbaum)*, 10 B.R. 420 (Bankr.S.D.Fla.1981); *Hadley v. Acquafredda (In re Acquafredda)*, 26 B.R. 909 (Bankr.M.D.Fla.1983); *Sol–Tabb, Inc. v. Total Acquisition Corp. (In re Total Acquisition Corp.)*, 29 B.R. 836 (Bankr.S.D.Fla. 1983).

The court believes that Citation misinterprets these holdings by failing to fully consider the facts in each of them. None of these

11. Fla.Stat. § 726.105 provides:
(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
1. Was engaged or was about to engage in a business or a transaction for which the

remaining assets of the debtor were unreasonably small in relation to the business or transaction;
2. Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
(2) In determining actual intent under paragraph (1)(a) consideration may be given, among other factors, to whether:
[List of 11 "badges of fraud" omitted].
Fla.Stat. § 726.105 (1993).

decisions involved a debtor-transferor whom the court determined was liable in damages to a creditor. These rulings do not stand for the proposition that the UFTA may be the justification for a damage award to a secured creditor assessed against a transferor of the secured creditor's collateral.

The court, in any event, concludes that when Ormond Beach in 1990 and 1991 utilized the net rents it did not do so with actual intent to hinder, delay or defraud the RTC or any creditor, that the RTC had made no demand on Ormond Beach for the rents, and that Ormond Beach's actions did not constitute a violation of § 726.105(2).

### D. Net Rents From November 17, 1989 through August 11, 1992

If Ormond Beach is ultimately determined to be liable in damages to Citation from having dissipated the net rents received at the Retirement Center for the period between November 17, 1989 and August 11, 1992, Citation claims $2,016,472.12 in damages based upon the testimony it presented through its accounting expert witness. The witness arrived at this amount by first estimating the amount of net rents Ormond Beach had on hand on November 17, 1989, i.e. $239,000. He then added to that sum $1,777,472.12 as the net rental income from November 17, 1989 through August 11, 1992. Ormond Beach's accounting expert witness testified that $962,528 was the proper computation.

When this same issue was tried in the Florida state court, that court, by order dated March 7, 1995, found the liability to be $994,748. This court concurs and finds the net rents to be $994,748, if this court's conclusions that Ormond Beach has no liability to Citation under Fla.Stat. §§ 697.07, 818.01, and 726.105 are reversed upon appeal.

### II. The Mortgage Deficiency Claim

On the issue of Ormond Beach's liability under Florida mortgage law for the 1983 mortgage deficiency judgment in the agreed amount of $13,236,213.14, each party submitted testimony from a Florida mortgage-law expert witness. The two expert witnesses agreed that neither the deed by which Or-

mond Beach acquired title to the Retirement Center nor the 1986 mortgage deed it executed in connection therewith contained any language providing for Ormond Beach's assumption of the 1983 mortgage indebtedness. Notwithstanding the lack of such mortgage assumption language, Citation offers two theories why the court should conclude that Ormond Beach is liable for the deficiency judgment.

First, Citation argues that certain express covenants contained in the recorded 1983 mortgage obligated all future owners of the Retirement Center to assume the mortgage debt. Second, Citation submits that because Ormond Beach violated the 1983 mortgage deed "due on sale" clause and failed to record the 1986 property transfer for five years, Citation is entitled to recover the mortgage-deficiency judgment from Ormond Beach.

### A. The Provisions of the 1983 Mortgage As Obligating Ormond Beach's Assumption of the Mortgage Debt

The following provisions in the 1983 mortgage, Citation asserts, expressly bound transferees of the Retirement Center to the covenants of the 1983 mortgage. *Exh. AE.*

*Performance of Note and Mortgage.* The Borrower will perform, observe and comply with all the provisions of this Mortgage, the Note and the Loan Agreement secured hereby and will duly and punctually pay to Lender the sum of money expressed in the Note, with interest and all other sums required to be paid by the Borrower pursuant to the provisions of this Mortgage, without any deductions or credit for taxes or other similar charges paid by the Borrower. [1983 Mortgage, Art. I, ¶ 1.01].

*Event of Default.* The term "Event of Default," wherever used in the Mortgage, shall mean any one or more of the following events: (a) Failure by Borrower to pay within ten (10) days after the same shall be due and payable, any amounts required to be paid under the Note.... [1983 Mortgage, Art. II, ¶ 2.01(a) ].

*Borrower to Pay the Note on Any Default in Payment; Application of Moneys by*

*Lender.* If default shall be made in the payment of any amount due under the Note or Mortgage, then upon demand of Lender, the Borrower will pay to Lender the whole amount due and payable under the Note; and in case the borrower shall fail to pay the same forthwith upon such demand, Lender shall be entitled to sue for and to recover judgment for the whole amount so due and unpaid together with costs, which shall include the reasonable compensation, expenses and disbursements of Lender's agents and attorneys, including appeals. [1983 Mortgage, Art. II, ¶ 2.10].

*Successors and Assigns Included in Parties.* Whenever in this Mortgage one of the parties hereto is named or referred to, the successors and assigns of such party shall be included and all covenants and agreements contained in this Mortgage by or on behalf of the Borrower or by or on behalf of Lender shall bind and inure to the benefit of their respective successors and assigns, whether so expressed or not. The term "Borrower" shall be deemed to include any future owner of the Mortgaged Property. [1983 Mortgage, Art. IV, ¶ 4.01].

Citation principally relies on the provisions in Art. IV, ¶ 4.01 of the 1983 mortgage which binds successors of the "Borrower" to the mortgage covenants and specifies: "The term 'Borrower' shall be deemed to include any future owner of the Mortgaged Property." Citation reasons that since Ormond Beach became RC of A's successor under the 1983 Mortgage, and an owner of the "Mortgaged Property", Ormond Beach impliedly assumed the 1983 mortgage and is liable for the full amount of the deficiency. Citation cites *Ehrlich v. Mangicapra*, 626 So.2d 702 (Fla. 4th DCA 1993) as the case authority in support of its position.

In *Ehrlich,* two mortgagors executed a mortgage deed, but only one had executed the promissory note thereby secured. The mortgagee thereafter sought to hold the non-notesigning mortgagor personally liable for the unpaid balance of the note, based upon the following mortgage deed covenant: "And the mortgagor hereby further covenants and agrees to pay promptly when due the principal and interest and other sums of money provided for in said note and the mortgage . . . ." 666 So.2d at 703. The *Ehrlich* court ruled that such a mortgage covenant supports an action at law on the covenant even though there is no viable cause of action against the non-notesigning mortgagor on the note itself. 626 So.2d at 703.

*Ehrlich* is inapposite to the present matter because Ormond Beach was neither a maker of the 1983 mortgage nor a maker of the mortgage note. At trial, Citation's expert witness conceded he knew of no Florida case law which has expressly ruled upon the theory of liability that Citation was advancing based upon ¶ 4.01 of the 1983 mortgage deed. *Transcript 7/24/96* at 153.

■ Florida case law on the subject of mortgage assumption seems to be unexceptional. The Florida Supreme Court has long held that the grantee of land which is subject to a mortgage assumes no personal liability for the obligation secured by the mortgage where he has not expressly agreed to do so. *Alabama–Florida Co. v. Mays,* 111 Fla. 100, 109, 149 So. 61, 65 (Fla.1933) ("He is liable neither legally nor equitably to indemnify his grantor against the mortgage, and he cannot be compelled to pay the mortgage debt by the mortgagee." There must exist an agreement which " 'import[s] an intention by the grantor to create, and by the grantee to assume, a personal obligation to pay the mortgage debt.' ") (internal citations omitted). A mortgagee, to hold a grantee personally liable for the mortgage debt, must establish the existence of an assumption agreement, whether express, implied, or parol, by clear and convincing proof. *Yates v. St. Johns Beach Development Co.,* 129 Fla. 411, 414–15, 176 So. 422, 423 (Fla.1937) (Assumption agreements "will not be inferred from the fact that the grantee had knowledge of the encumbrance on which they are based, . . . in the absence of a showing that at the time the transfer was made or subsequently he agreed to do so.").

In addition to the testimony received from both experts that none of the 1986 transfer and loan documents contained language of mortgage assumption, Professor Barbara

Taylor Mattis, Ormond Beach's expert witness, observed that the 1986 note, *Exh. BN,* clearly provides that "[e]xcept to the extent expressly provided herein, the Holder hereof does not hereby assume any obligation under or in respect of the Prior Notes and the Prior Liens, . . . [and] [n]othing herein contained shall be construed to create any third party beneficiary rights in any person not a party hereto, . . ." *Exh. BN* at 3–4. Professor Mattis expressed the opinion that "it was well settled that a covenant in the mortgage to perform the secured obligation does not touch and concern the land and hence does not run with the land and burden nonassuming grantees", citing Restatement of the Law 3d Property–Security (Mortgages) Tentative Draft No. 2 (March 25, 1992) § 5.2. *Transcript 7/31/96* at 223.

■ The court concludes that the Florida Supreme Court would rule that the mortgage covenants Citation relies upon are insufficient to impose personal liability upon Ormond Beach because (1) Ormond Beach did not expressly or impliedly assume the mortgage debt and (2) the covenant of payment does not touch and concern the land and therefore does not by itself bind non-assuming grantees. In short, the court credits the reasoned testimony of Professor Mattis.

B. *The Violation of A "Due on Sale" Clause As Entitling Citation to Recover the Mortgage–Deficiency Judgment from Ormond Beach*

The following provisions of the 1983 mortgage and note constitute the basis of Citation's contention for establishing Ormond Beach's liability.

*Transfer.* In the event the Borrower, without the prior written consent of the Lender or holder hereof, shall sell, convey, transfer or lease (other than a lease to tenants in the ordinary course of business) (or shall contract to sell, convey or transfer in exchange for installment payments) the Mortgaged Property or any part thereof or any interest therein, or shall be divested of title or any interest therein in any manner or way, whether voluntary or involuntary, the entire balance of the indebtedness shall be accelerated and become immediately

due and payable, at the option of the Lender upon thirty (30) days written notice to the Borrower. In the event Lender elects to accelerate the entire balance of the indebtedness, Borrower shall have no obligation to allege or show any impairment of its security and may pursue any legal or equitable remedies for default in such payment without such allegation or showing. [1983 Mortgage, Art. 3, ¶ 3.05–Exh. AE].

At the option of the holder of this Note, the entire principal balance hereof and accrued interest owing thereon shall at once become due and payable without notice or demand upon the occurrence at any time of . . . [t]he sale, lease (except for leases to the tenants of the Project entered into by Payee in the ordinary course of business), conveyance or transfer, or the entering into a contract to sell, lease, convey or transfer, without the prior written consent of Payee, of the Mortgaged Premises (hereinafter defined) or any part thereof or any interest therein, or the divestment of legal or equitable title or any interest therein, in any manner, whether voluntarily or involuntarily[.] [1983 Note, p. 6, ¶ 11(*o*)–Exh. AD].

The note also required the Borrower to immediately notify the mortgagee in writing of "any contract to sell or lease (other than in the ordinary course of business) the Project or any offer to buy or sell the Project." *Id.* at 2 ¶ 3(d).

Citation contends that there can be no question that the sale of the Retirement Center by RC of A to Ormond Beach violated the due-on-sale clause contained in the 1983 mortgage and note. Citation alleges that Ormond Beach "took affirmative steps to avoid notifying the mortgagee of the sale by failing to record the deed to the property at or after the time of sale, by keeping the property tax bills for the property in RC of A's name and by not paying any transfer tax upon the sale as required by law." *Citation Opening Memorandum* at 48. Citation asserts that this violation of the due-on-sale clause, in combination with the effort of RC of A and Ormond Beach to conceal the sale, entitles Citation to a deficiency judgment.

Ormond Beach responds that "[w]hile a due-on-sale clause grants to the mortgagee the right to foreclose on its collateral, including any interest of a subsequent grantee," it does not give the mortgagee a cause of action for the deficiency against the subsequent grantee. *Ormond Beach's Post–Trial Brief* at 66. Alternatively, Ormond Beach asserts that, even if the court finds that Ormond Beach is personally liable pursuant to a violation of the due-on-sale clause, Citation has not sufficiently proven that Ormond Beach's acquisition of the Retirement Center was in violation of the 1983 loan documents. *Id.*

Citation focuses upon the relationship between RC of A and Ormond Beach in asserting that Ormond Beach cannot claim that it was unaware of these provisions. At the time of the sale, William S. Friedman ("Friedman"), was both the vice president of RC of A's general partner, and the general partner of Equity, Ormond Beach's original general partner. Friedman signed the contract of sale, the 1986 mortgage and the deed on behalf of both the buyer, Ormond Beach, and the seller, RC of A. *Exhs. BI, BM, BO.* Friedman, in addition, was the president of Southmark at the time of the sale. *Exh. BL.* The transfer remained unrecorded until December 13, 1991, when LPIMC filed the affidavit of title. *Exh. GT.*

Citation's expert witness testified that "[i]f the mortgagor conceals the transfer and does so, as would indicate in this particular transaction, since the mortgage—the transfer—or a transferee were both represented by apparently the same parties, obviously, a change in the personnel might alert a mortgagee, under normal circumstances. But if there was no, in fact, change in personnel between a transfer [sic] or a transferee, then they would effectively take away the rights and remedies of the due-on-sale provision." *Transcript 7/24/96* at 138. The mortgagee loses the right "to accelerate and declare immediately due and payable the debt at the time the transfer occurred." *Id.* The expert witness conceded that a due-on-sale clause, by itself, does not impose personal liability on the subsequent purchaser. *Id.* at 154. Professor Mattis opined that one of the purposes of the due-on-sale clause is to allow the mort-

gagee to "condition ... consent on the grantee's agreement to assume, but if the grantee does not want to assume, he can still get the property. The debt will be accelerated." *Transcript 8/1/96* at 24.

■ Florida law recognizes the enforcement of a due-on-sale clause. *Rubin v. Centerbanc Federal Savings & Loan Association,* 487 So.2d 1193, 1194 (Fla. 2d DCA 1986) ("It is now settled that a lender may enter into or enforce a contract containing a due-on-sale clause with respect to a real estate loan. Any limitation of this right must be clearly set forth in the contract involved."). The Supreme Court of Arizona has ruled that no personal liability may be imposed on a grantee who acquires title without consent from a mortgagee when a due-on-sale clause exists. *Esplendido Apartments v. Metropolitan Condominium Association,* 161 Ariz. 325, 329, 778 P.2d 1221, 1225 (Ariz.1989) (due-on-sale clause runs with the land and binds nonassuming grantee; mortgagee's remedy in that situation is acceleration and foreclosure, not damages against the grantee).

■ The record indicates that while Ormond Beach may have purchased the Retirement Center without Freedom's consent, in violation of the due-on-sale clause, and failed to record evidence of the transfer, RTC/Freedom was on notice of the transfer at least by the date of the filed Relief/Stay Motion. *See also Ormond Beach Associates Limited Partnership Private Placement Memorandum,* Exh. 1 (advises "selected group of investors" that "capital contributors sought to acquire interests" in Ormond Beach for the purpose of acquiring, owning and operating The Retirement Center and The Nursing Center in 1986). The court accepts the position of Professor Mattis that a violation of the due-on-sale clauses contained in the 1983 mortgage and the note does not support holding Ormond Beach liable for the deficiency judgment. The court concludes that the Florida Supreme Court would so rule.

### CONCLUSION

Ormond Beach filed this adversary proceeding to object to Citation's proofs of claim

and to seek a determination of Citation's assertion that it held interests in Ormond Beach's property either as a secured creditor or as an equitable lien holder. On the first day of trial, Citation conceded that it held no claim as a secured creditor or as the holder of an equitable lien. For the reasons herein set forth, the court has concluded that none of Citation's claims as an unsecured creditor should be allowed. A judgment will enter that Citation does not hold any interest in property of the Chapter 11 estate of Ormond Beach and that Citation's proofs of claim are disallowed.