184 F.3d 143 (2nd Cir. 1999)
 In Re: ORMOND BEACH ASSOCIATES LIMITED PARTNERSHIP, Debtor.
CITATION MORTGAGE, LTD. and CITATION MORTGAGE CORPORATION,
Creditors-Appellants,
CITATION-ORMOND IN THE PINES, LTD., Creditor,
v.
ORMOND BEACH ASSOCIATES LIMITED PARTNERSHIP, Debtor-Appellee.
 Docket No. 98-5030
August Term, 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued Feb. 18, 1999
Decided June 23, 1999
 
 In the wake of a mortgage default in Florida, appellants filed a state-court lawsuit against appellee seeking to recover, among other things, (1) the deficiency on the mortgage and (2) damages, pursuant to any of three Florida statutes, for appellee's failure to preserve and turn over rents collected with respect to the collateral property. Upon appellee's insolvency, appellants asserted these claims against the estate in bankruptcy. Appellee objected and, after trial, the United States Bankruptcy Court for the District of Connecticut (Krechevsky, B.J.) disallowed both claims. That decision was affirmed by the United States District Court for the District of Connecticut (Goettel, J.).
 
 
 1
 Affirmed. [Copyrighted Material Omitted]
 
 
 2
 JOHN H. PELZER, Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, FL, for Creditors-Appellants.
 
 
 3
 LEIGHTON AIKEN, DANA M. CAMPBELL, Owens, Clary & Aiken, L.L.P., Dallas, TX, IRA H. GOLDMAN, Shipman & Goodwin, Hartford, CT, for Debtor-Appellee.
 
 
 4
 Before: KEARSE and SACK, Circuit Judges, and STEIN, District Judge.*
 
 SACK, Circuit Judge:
 
 5
 At the core of this appeal is a conflict over a mortgage default in Florida. Payments on the mortgage have long-since ceased and the collateral property was sold at auction long ago for a sum insufficient to cover the mortgaged debt. Filing suit in Florida state court, appellants sought, among other things, to recover that deficiency from appellee Ormond Beach Associates, L.P. ("Ormond Beach"), as well as damages for Ormond Beach's allegedly inappropriate dissipation of rents collected from the collateral property. When Ormond Beach subsequently filed a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Connecticut (Krechevsky, B.J.), appellants filed proofs of these claims against the estate. Upon trial of Ormond Beach's objections in an adversary proceeding, the bankruptcy court disallowed appellants' claims. The United States District Court for the District of Connecticut (Goettel, J.) affirmed, and appellants appeal to this Court.
 
 
 6
 Appellants argue that the bankruptcy and district courts erred in determining that Ormond Beach was not liable for past rent from the collateral property under (1) Fla. Stat. Ann. §697.07 (1998), which establishes a protocol for the enforcement of a collateral assignment of rents, (2) Fla. Stat. Ann. §818.01 (1998), which prohibits the disposal of personal property subject to a lien without the written consent of the lienholder, or (3) Fla. Stat. Ann. §726.105 (1998), which prohibits a debtor from transferring property with the actual intent to hinder, delay, or defraud a creditor. Appellants contend also that the bankruptcy and district courts erred in rejecting the claim that Ormond Beach is liable for the deficiency on the mortgage either because it is bound by the mortgage's covenant to pay or is in violation of the mortgage's due-on-sale clause.
 
 
 7
 Finding each of appellants' arguments unpersuasive, we affirm.
 
 BACKGROUND
 
 8
 This appeal involves several relatively straight- forward questions about the law affecting creditors' rights. They arise, however, out of a complex history of lengthy and sometimes stealthy dealings among many entities in several states. The circumstances underlying this appeal are described in considerable detail in the opinion of the bankruptcy court below, see In re Ormond Beach Assocs. L.P., 204 B.R. 336, 338-43 (Bankr. D. Conn. 1996), as well as the unpublished disposition of the district court, see In re Ormond Beach Assocs. L.P., No. 3:97CV210 (GLG) (D. Conn. Feb. 17, 1998). We rehearse the facts only insofar as we think necessary to address the issues raised on appeal.
 
 
 9
 The seeds of this litigation were planted on August 11, 1983, when RC of A Retirement Living Ltd., Series III ("RCofA III") borrowed $12,000,000 from Freedom Savings & Loan, F.A. ("Freedom"), a Florida savings and loan, in order to purchase real estate in Volusia County, Florida and to construct a retirement center on that land. Simultaneously, RC of A Retirement Living Ltd., Series I ("RCofA I") entered into a similar arrangement with Freedom to finance the purchase and construction of a nursing home on an adjacent parcel of land.
 
 
 10
 Both RCofA I and RCofA III were limited partnerships syndicated by Southmark Corp. ("Southmark"), a publicly owned Georgia corporation in the business of syndicating limited partnerships as real estate investment vehicles in the nursing, retirement, and health care industries. RCofA III's general partner was Retirement Corporation of America Properties, Inc., a Florida corporation owned by Southmark. Its officers were principals of Southmark. The retirement center and the nursing home, known collectively as "Ormond-in-the-Pines," were operated together by another Southmark subsidiary named Retirement Corporation of America, Inc.
 
 
 11
 At the heart of RCofA III's financing arrangement with Freedom was a promissory note from RCofA III to Freedom in the amount of $12,000,000 (the "1983 note"), which was secured by several instruments including a recorded construction mortgage on the retirement center (the "1983 mortgage") and a recorded collateral assignment of rents. The financing agreement associated with the arrangement included various provisions addressing the consequences of a transfer of ownership of the mortgaged property. The 1983 mortgage, for example, contained a provision purporting to bind subsequent purchasers of the mortgaged property to the terms of the 1983 mortgage, including the obligation to pay back the 1983 note which the mortgage secured:
 
 
 12
 4.01 Successors and Assigns Included in Parties. Whenever in this Mortgage one of the parties hereto is named or referred to, the successors and assigns of such party shall be included and all covenants and agreements contained in this Mortgage by or on behalf of the Borrower . . . shall bind . . . [its] successors and assigns, whether so expressed or not. The term "Borrower" shall be deemed to include any future owner of the Mortgaged Property.
 
 
 13
 The 1983 mortgage also contained a due-on-sale clause:
 
 
 14
 3.05 Transfer. In the event the Borrower, without the prior written consent of the Lender or holder hereof, shall sell, convey, transfer or lease . . . the Mortgaged Property . . . the entire balance of the indebtedness shall be accelerated and become immediately due and payable, at the option of the Lender upon thirty (30) days['] written notice to Borrower.
 
 
 15
 The 1983 note contained a similar provision authorizing Freedom to accelerate the debt upon the occurrence of any one of several events, including the "sale, lease . . . conveyance or transfer... without the prior written consent of [Freedom], of the Mortgaged Premises . . . ."
 
 
 16
 In May 1985, Southmark guaranteed RCofA III's obligations to Freedom under the terms of the financing agreement, and the 1983 note and mortgage were amended to reflect the guarantee.
 
 
 17
 In September 1986, RCofA III quietly conveyed title to the retirement center and its underlying real property to Ormond Beach, also a Southmark-syndicated limited partnership. Ormond Beach's general partner was a Texas limited partnership, the general partners of which were principals of Southmark. At the same time that it acquired the retirement center, Ormond Beach acquired from RCofA I the nursing home and its underlying real property. Thus the Ormond-in-the-Pines retirement and nursing home facilities were united under one owner, Ormond Beach. In return, Ormond Beach executed in favor of both RCofA I and RCofA III a promissory note in the amount of $17,985,000 (the "1986 note"), secured by a wrap-around mortgage (the "1986 wrap-around mortgage"). The deed evidencing this transaction was not recorded by Ormond Beach, however, nor was Freedom notified of it. Florida tax was not paid on the transfer either. Indeed, tax bills continued to be sent in RCofA III's name and were paid. Freedom thus was not made aware of the rights that may have thereby arisen under the 1983 note and the 1983 mortgage for Freedom to accelerate the obligations to pay under the note and mortgage.
 
 
 18
 Regarding the impact of the new arrangement on the parties' obligations under the 1983 note and mortgage, the 1986 note stated:
 
 
 19
 Maker [Ormond Beach] and Holder [RCofA I and RCofA III] hereby acknowledge that the Project is presently encumbered by the Prior Liens described in the Mortgage. Maker and Holder further acknowledge that Maker is not purchasing the Project "subject to" or "in assumption of" the Prior Liens or the indebtedness secured thereby....
 
 
 20
 Consistently, provisions in the 1986 wrap-around mortgage from Ormond Beach to RCofA I and III discuss RCofA I and III's continuing obligation to make principal and interest payments under the 1983 note and mortgage to Freedom. RCofA III[1] then assigned to Southmark its interest in the 1986 note and wrap-around mortgage from Ormond Beach to RCofA III.
 
 
 21
 After these transactions were completed, Ormond Beach made regular payments to RCofA III or Southmark under the 1986 note and wrap-around mortgage, and RCofA III or Southmark in turn made regular payments under the 1983 note and mortgage to Freedom. As long as Freedom was paid, it apparently did not know and may not have particularly cared about the various transfers involving the Ormond-in-the-Pines facilities and Ormond Beach.
 
 
 22
 The pattern collapsed, however, when Southmark filed for relief under Chapter 11 of the Bankruptcy Code in Bankruptcy Court in Atlanta, Georgia on July 14, 1989. Its bankruptcy estate was transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division on October 3, 1989. At about this time, RCofA III and Southmark ceased making payments to Freedom under the 1983 note and mortgage, and Ormond Beach ceased making payments to Southmark on the 1986 note and wrap-around mortgage.
 
 
 23
 Complicating matters, Freedom, like many another S&L in the late 1980's, soon succumbed to insolvency too. On October 12, 1989, the Resolution Trust Corporation (the "RTC") became Freedom's receiver, and quickly took steps to enforce Freedom's rights against Southmark under Southmark's 1985 guaranty of the 1983 note and mortgage. On November 17, 1989, the RTC filed a motion for relief from the automatic stay of actions against Southmark that was in effect in Southmark's bankruptcy proceedings or, in the alternative, for the sequestration and accounting of rents and proceeds from the retirement center. Alleging that Southmark-affiliated entities controlled rent-collection at Ormond Beach's Ormond-in-the-Pines facilities, the RTC demanded
 
 
 24
 that the rents and proceeds received or to be received from the sale or use of any properties securing the RTC/Freedom Claims be paid directly to the RTC, in its capacity as receiver for Freedom, in accordance with the terms of the agreements evidencing the RTC/Freedom Claims [the 1983 note, mortgage, and collateral assignment of rents].
 
 
 25
 Ormond Beach itself was not served with this motion, however, either directly or through its attorneys.
 
 
 26
 In the wake of the RTC's demand for the Ormond-in-the-Pines rents, on February 16, 1990, the Southmark bankruptcy court entered an agreed order obliging Southmark to open an escrow account for any net operating income it may have received or would receive with respect to the Ormond-in-the-Pines facilities for the period starting July 14, 1989. Subsequently, Retirement Corporation of America, Inc., the Southmark-controlled entity that still served as the manager of Ormond-in-the-Pines, sent $29,000 to the new escrow account. Aside from this amount, however, the net rents collected from the facilities were kept or otherwise disposed of by Ormond Beach rather than being deposited in the escrow account.
 
 
 27
 Then, on July 5, 1990, the Southmark bankruptcy court entered another agreed order, this time modifying the automatic stay in order to permit the RTC to foreclose on the 1983 mortgage on the Ormond-in-the-Pines facilities. Although the RTC obtained the order, for reasons unknown it did not actually seek foreclosure.
 
 
 28
 A few weeks later, the bankruptcy court confirmed a plan of reorganization for Southmark under which any distributions from Southmark's estate to the RTC would be placed in an escrow account until the RTC's claims against the estate were allowed. Then, on September 6, 1990, the RTC and Southmark filed a joint motion for approval of the RTC's unsecured proof of claim in the amount of $4,985,490, reflecting Southmark's debt under the 1983 note less the fair market value of the Ormond-in-the-Pines facilities, which the parties apparently expected would be foreclosed upon at a later date by the RTC in satisfaction of the remainder of the debt. On November 7, 1990, the bankruptcy court allowed the claim for $4,985,490 as a "compromise and settlement" of the RTC's claim against Southmark's estate.
 
 
 29
 At about this time, a Texas state-court lawsuit arising out of proxy-contests concerning the ownership structure of at least thirty-four Southmark-syndicated limited partnerships including Ormond Beach had culminated in an agreed judgment. Under that judgment, an independent entity known as the Limited Partner Investor Monitoring Committee, Inc. ("LPIMC") became the managing general partner of each of these partnerships, including Ormond Beach, where it replaced the former general partners affiliated with Southmark. Subsequently, on September 13, 1990, Southmark reached an agreement with the thirty-four limited partnerships, including Ormond Beach, pursuant to which Southmark agreed to release as satisfied any and all of Southmark's encumbrances on properties owned by the partnerships. The bankruptcy court approved the agreement. As a consequence, the 1986 note and wrap-around mortgage between Ormond Beach and Southmark was extinguished.
 
 
 30
 On December 13, 1991, Ormond Beach, with LPIMC still as its sole general partner, finally took steps to record its interest in Ormond-in-the-Pines. It recorded an "affidavit of title" dated November 15, 1991 with the office of public records in Volusia County, Florida. The affidavit stated that Ormond Beach and LPIMC had just learned that the 1986 sale of the property from RCofA III to Ormond Beach had never been recorded. Attached to the affidavit were copies of the deeds. The affidavit stated Ormond Beach's intent to record the originals once they were located.
 
 
 31
 In an effort to head off foreclosure, LPIMC began actively pursuing negotiations with the RTC concerning the 1983 note and mortgage, which continued to encumber the Ormond-in-the-Pines facilities. Between August 1990 and the end of 1991, LPIMC and the RTC held several meetings and exchanged letters discussing possible refinancing. At no point, however, did the RTC articulate a demand for rents from the retirement center, nor did it suggest that such a demand already had been made.
 
 
 32
 These negotiations came to naught. On January 9, 1992, the RTC advised LPIMC that it had sold all of its interests in the 1983 mortgage and related loan materials to appellant Citation Mortgage Ltd., a limited partnership whose general partner was appellant Citation Mortgage Corporation (the partnership and general partner collectively hereinafter "Citation"). Citation had been formed for the sole purpose of purchasing a portfolio of twenty-three mortgages from the RTC.
 
 
 33
 On May 14, 1992, Citation sent a letter to RCofA III, with copies to Ormond Beach and LPIMC, stating that "any and all work-out negotiations with respect to the [1983 mortgage] have been terminated" and that Citation was exercising its right to accelerate the debt and foreclose on the mortgage. The total due, according to Citation, was $17,803,365.29. On June 3, 1992, Citation issued a written demand to RCofA III for all rents from the retirement center pursuant to Fla. Stat. Ann. §697.07, which provides a framework for the enforcement of a collateral assignment of rents. On June 11, Citation issued a similar demand letter to Ormond Beach:
 
 
 34
 Recently it has come to our attention that you apparently possess, manage and operate the [Ormond-in-the-Pines] Property. Further, it has come to our attention that you collect and are in possession of the Rents from the Property. We are not certain as to how you came into possession of the Property and the Rents.
 
 
 35
 In light of the foregoing, we deem you to be at least [RCofA III's] agent for the management and operation of the Property. Accordingly, we are hereby placing you on notice of our demand for the Rents as outlined in the enclosed letter. We fully expect you to turn-over the Rents immediately to Citation. If you fail to do so, we will seek to hold you liable and your principals personally liable, in as much as the law provides.
 
 
 36
 At the time, Citation apparently was unaware of the RTC's previous demand on Southmark in its bankruptcy proceedings for the rents, and of the unrecorded transfer of title to the Ormond-in-the-Pines facilities from RCofA III to Ormond Beach. Citation also may have been unaware of the settlement reached between the RTC and Southmark, which resulted in allowance of a claim against Southmark's estate in the amount of $4,985,490, representing the anticipated post-foreclosure deficiency on the 1983 note.
 
 
 37
 Two weeks later, Citation filed suit in Florida state court against Ormond Beach and others seeking, inter alia, (1) foreclosure of the 1983 mortgage, (2) foreclosure of the 1983 collateral assignment of rents pursuant to Fla. Stat. Ann. §697.07, and (3) the entry of a deficiency judgment. The complaint was later amended to add, among other things, state-law causes of action for civil theft in violation of Fla. Stat. Ann. §818.01, and fraudulent transfer in violation of Fla. Stat. Ann. §726.105, concerning Ormond Beach's distribution of rent proceeds to its partnership at a time when the rents allegedly were owed to either the RTC or Citation.
 
 
 38
 On July 24, 1992, the Florida court entered an agreed order pursuant to § 697.07 sequestering rents from the Ormond-in-the-Pines facilities (the "Deposit Order"). Specifically, the court ordered Ormond Beach to deposit with the court the net operating income received as rent from the retirement center for the period from the date of Citation's written demand for rent on Ormond Beach, June 1992, to be distributed later in accordance with the court's order. Over the next few months, Ormond Beach made the required deposits. A receiver later was appointed to take over this duty. Eventually, a total of $150,045.20 was placed in the court's registry.
 
 
 39
 On October 16, 1992, Citation moved to expand the Deposit Order to include not only rents accumulated since June 1992, but also rents collected between the time of the RTC's November 1989 motion in the Southmark bankruptcy proceeding and the July 24, 1992 entry of the Deposit Order. In support, Citation argued that (1) the RTC's November 1989 motion for sequestration of rents in the Southmark bankruptcy proceeding constituted a demand for rent effective against Ormond Beach for purposes of § 697.07, (2) the bankruptcy court's subsequent order creating an escrow account for Southmark's net operating income from the Ormond-in-the-Pines facilities constituted a judicial order of sequestration pursuant to §697.07, and (3) Ormond Beach accordingly had been obligated ever since to sequester the net rents it had collected in connection with the operation of the facilities. And on December 3, 1992, Citation moved for partial summary judgment on its foreclosure claims.
 
 
 40
 Before the Florida court ruled on Citation's motion to expand the Deposit Order, it granted the motion for partial summary judgment. Specifically, the court found that the amount due under the 1983 note and mortgage, with interest and costs, was $18,985,648.88 and directed the sale of the Ormond-in-the-Pines facilities in partial satisfaction of that debt. The court also held that Citation was entitled to the monies sequestered pursuant to the Deposit Order as rent accumulated subsequent to June 11, 1992. The court declined to decide at that time, however, whether Citation was also entitled to rents for the period between November 1989 and June 11, 1992. Pursuant to the order granting partial summary judgment, the retirement center was sold -- to Citation -- for $6,610,000, leaving a considerable deficiency.
 
 
 41
 The Florida court then held a hearing on the still-pending motion to expand the scope of the Deposit Order to include rents accumulated between the RTC's November 1989 motion in the Southmark bankruptcy proceeding and the June 1992 date of the Deposit Order. On July 16, 1993, the court ruled in Citation's favor, finding as a fact that Southmark, on November 17, 1989, "was ORMOND BEACH's agent for notice/receipt of all documents served/filed" in the Southmark bankruptcy, and concluding as a matter of law that:
 
 
 42
 CITATION's Mortgage Lien attaches to all net operating income generated by the Ormond Retirement Center. The Court finds that CITATION's predecessor in interest, the Resolution Trust Corporation, in its capacity as receiver for Freedom Savings & Loan Association, F.A., properly perfected its claim to the net operating income, under a collateral assignment of rents executed by the mortgagor, by filing and serving the requisite written demand on November 17, 1989 through service of a pleading in the Southmark bankruptcy action entitled "THE RESOLUTION TRUST CORPORATION'S MOTION FOR RELIEF FROM AUTOMATIC STAY, REQUEST FOR ADEQUATE PROTECTION AND SEQUESTRATION AND AN ACCOUNTING OF RENTS AND PROCEEDS."
 
 
 43
 The court therefore expanded the Deposit Order to require Ormond Beach to deposit all accumulated net operating income from this period still in its possession into the court's registry "to be applied and distributed upon determination of [Citation's] claim for a deficiency decree." This decision was affirmed in Ormond Beach Assocs. L.P. v. Citation Mortgage Ltd., 634 So.2d 1091 (Fla. Dist. Ct. App. 1994).
 
 
 44
 On April 25, 1994, the Florida trial court held a hearing on Citation's motion to enforce the now-affirmed expanded Deposit Order. After taking conflicting evidence concerning the amount of net operating income received during the 1989-1992 period and retained by Ormond Beach, the court adjourned the proceedings for three days. The court planned to take up on April 28 the question of contempt sanctions, including possible incarceration, for individual general partners of Ormond Beach for allegedly failing to have abided by the order.
 
 
 45
 The next day, April 26, however, Ormond Beach filed for Chapter 11 relief in the Bankruptcy Court for the District of Connecticut, resulting in an automatic stay of the Florida action. In response, Citation filed proofs of claim in Ormond Beach's bankruptcy proceeding. Among other things, Citation asserted two rights -- a claim for $1.9 million in damages for Ormond Beach's failure to preserve back rent from the Ormond-in-the-Pines facilities, and a claim for approximately $12.1 million representing the deficiency on the mortgage post-foreclosure that are the subject of this appeal. Ormond Beach objected to both these claims in the bankruptcy proceedings, and instituted an adversary proceeding against Citation.
 
 
 46
 Before trial, Citation moved in limineto preclude Ormond Beach from re-litigating three issues that it asserted had already been finally determined by the Florida courts: (1)Southmark was Ormond Beach's agent for purposes of notice and receipt of the RTC's November 1989 demand for rent, (2)the RTC demand resulted in a lien in the RTC's favor on all rents collected from that time forward, and (3)the net operating income for that period amounted to $994,748. The bankruptcy court denied the motion, finding that the Florida courts' rulings were interlocutory orders lacking the finality required under Florida law for application of res judicata or any other principle of preclusion.
 
 
 47
 Trial of the adversary proceeding began on July 24, 1996 and, after four days of hearings, the bankruptcy court sustained Ormond Beach's objections, disallowing Citation's damages and deficiency claims. In rejecting Citation's claim that it was entitled under § 697.07 to damages for the dissipation of the back rent, the court reasoned that the RTC motion in Southmark's bankruptcy proceedings during November 1989 had not been a demand for rents effective as against Ormond Beach because Southmark was not Ormond Beach's agent for the receipt of such a demand. See In re Ormond Beach, 204 B.R. at 345-46. The court reasoned in the alternative that even were it to have found that the demand was effective, Ormond Beach would not be liable in damages under § 697.07 because the statute does not alter the Florida common-law rule permitting a mortgagor to make use of rents, even post-default and demand, unless and until a sequestration order is obtained. See id. at 347-48. The court also rejected the other two statutory bases invoked by Citation as grounds for recovering damages for the lost 1989-1992 rents: §818.01 did not apply because rents are not "personal property" within the meaning of that statute, and §726.105(2) did not apply because damages were not available under the statute in these circumstances and also because Ormond Beach did not act with actual intent to hinder, delay, or defraud a creditor. See id. at 350-51. Finally, the court rejected Citation's mortgage deficiency claim on the grounds that Ormond Beach did not assume any obligations under the 1983 mortgage, including the covenant to pay the 1983 note, when it acquired the Ormond-in-the-Pines facilities in 1986. The court held that the due-on-sale clause similarly was inapplicable. See id. at 353-54.
 
 
 48
 On January 8, 1997, Citation appealed the bankruptcy court's decision to the United States District Court for the District of Connecticut, which affirmed in a lengthy, unpublished decision by Judge Goettel on February 17, 1998. In re Ormond Beach Assocs. L.P., No. 3:97CV210 (GLG) (D. Conn. Feb. 17, 1998). Citation appeals once more.
 
 DISCUSSION
 
 49
 "Our review of an appeal that proceeds from the bankruptcy court to the district court is plenary and independent. We affirm factual findings unless clearly erroneous and review legal conclusions de novo." In re Chalasani, 92 F.3d 1300, 1306 (2d Cir. 1996); see also In re Palm Coast, Matanza Shores Limited Partnership, 101 F.3d 253, 256 (2d Cir. 1996).
 
 
 50
 Citation's appeal presents two sets of issues:
 
 
 51
 (1) whether the court below correctly determined that Citation is not entitled to recover damages from Ormond Beach to compensate for the loss of rent from the Ormond-in-the-Pines facilities for the period from November 1989 through June 11, 1992, pursuant to Fla. Stat. Ann. §697.07 (procedure for the enforcement of a collateral assignment of rents), § 818.01 (prohibiting the disposal of personal property subject to lien without written consent of lien-holder), or § 726.105 (prohibiting fraudulent transfers); and
 
 
 52
 (2) whether the court below correctly determined that Citation is not entitled to recover damages from Ormond Beach for the post-foreclosure deficiency on the 1983 mortgage, pursuant either to the 1983 mortgage's covenant to pay the 1983 note or its due-on-sale clause.
 
 I. Damages for Lost Rent
 
 53
 Citation's first claim against Ormond Beach's estate alleges that Citation is entitled to damages compensating it for Ormond Beach's failure to sequester and transfer to it rents, less operating costs, collected from November 1989 through June 1992 in connection with the operation of the Ormond-in-the-Pines facilities. Citation alleges that it is entitled to this relief under any one or more of three Florida statutes: Fla. Stat. Ann. §§697.07, 818.01, and 726.105. We agree with the bankruptcy court and the district court that none of these statutes provides the relief Citation seeks.
 
 A. Section 697.07
 
 54
 Fla. Stat. Ann. § 697.07 codifies a protocol for the enforcement of collateral assignments of rents. Section 697.07, the text of which is set forth as an appendix to this opinion, provides in relevant part that
 
 
 55
 the assignment of rents shall be enforceable upon the mortgagor's default and written demand for the rents made by the mortgagee to the mortgagor, whereupon the mortgagor shall turn over all rents in the possession of the mortgagor at the time of the written demand or collected thereafter (the "collected rents") to the mortgagee less payment of any expenses authorized by the mortgagee in writing.
 
 
 56
 Fla. Stat. Ann. § 697.07(3).
 
 
 57
 Citation's claim, in substance, is that it is entitled to damages under this statute because (1) the RTC motion in November 1989 for sequestration of rents in the Southmark bankruptcy constituted a written demand for rents effective as to Ormond Beach under §697.07(3); (2) Ormond Beach at that point became obligated under §697.07 not to dissipate the rents but instead to give them over to the RTC; and (3) Ormond Beach's failure to do so warrants damages.
 
 
 58
 In rejecting this claim, the bankruptcy court reasoned first that the November 1989 RTC motion was not an effective §697.07 demand as to Ormond Beach because Southmark was not Ormond Beach's agent for notice and receipt of such demand. See In re Ormond Beach, 204 B.R. at 344-46. The court held in the alternative that, even assuming that a valid demand had been made, Ormond Beach was not restricted in its right to collect and distribute rent from the retirement center until the entry of a sequestration order, an event that did not occur until July 24, 1992.
 
 
 59
 Citation argues that the bankruptcy court erred in both respects, contending that (1) the validity of the demand previously was established in the Florida state court litigation, preventing the bankruptcy court and us from revisiting the issue under the doctrine of res judicata; (2) even if the bankruptcy court was free to decide the issue the demand was effective as to Ormond Beach under Florida law; and (3) once default and demand occurred in 1989, Ormond Beach was obliged to preserve and turn over to it or its predecessor in interest rents from the retirement center. Irrespective of the merits of Citation's arguments (1) and (2), we disagree as to (3) and therefore affirm.
 
 1. Ormond Beach's Duties under § 697.07
 
 60
 Even assuming that the validity of the 1989 RTC demand is established as to Ormond Beach, Citation's claim fails because it cannot show that Ormond Beach breached any duty under §697.07 by failing to preserve rents collected subsequent to that demand but prior to the Florida court's intervention in 1992.
 
 
 61
 a. Assignments of Rent Under Florida Common Law and the Impact of § 697.07
 
 
 62
 At Florida common law, which follows the lien-theory of mortgage obligations, the general rule has been that title does not pass from mortgagor to mortgagee absent judicial action. The mortgagor in the meantime remains at liberty to dispose of the encumbered property as it sees fit despite the occurrence of a default. See In re Villamont-Oxford Assocs. Limited Partnership, 230 B.R. 445, 450 (Bankr. M.D. Fla. 1998) (mortgagor in possession may continue to collect rents); White v. Anthony Inv. Co., 160 So. 881, 882 (Fla. 1935) ("the general rule is that [a] mortgagee becomes entitled to receive such rents . . . from the time he takes possession of the property either by the consent of the owner or through the appointment of a receiver in foreclosure proceedings"); Carolina Portland Cement Co. v. Baumgartner, 128 So. 241, 245 (Fla. 1930) ("as long as the mortgagor continues in possession, he can collect the rents"). The question presented by Citation is whether the adoption of §697.07, codifying the process for foreclosure on a collateral assignment of rents, changed that rule by effecting the transfer of possessory rights merely upon the debtor's default and the creditor's demand and before judicial intervention.
 
 
 63
 The weight of Florida authority takes the view that §697.07 was not intended to alter the common law approach or otherwise modify any substantive rights but, instead, merely provides a specific procedural mechanism for the enforcement of collateral assignments of rent. See Ginsberg v. Lennar Florida Holdings, Inc., 645 So.2d 490, 496 (Fla. Dist. Ct. App. 1994) (pre-1993-amendment version of §697.07 not intended to alter the common law approach to rights allocation), review denied, 659 So.2d 272 (Fla. 1995); Oakbrooke Assocs., Ltd. v. Insurance Comm'r of California, 581 So.2d 943, 946 (Fla. Dist. Ct. App. 1991) (same); Nassau Square Assocs., Ltd. v. Insurance Comm'r of California, 579 So.2d 259, 261 (Fla. Dist. Ct. App. 1991); accord In re Villamont-Oxford, 230 B.R. at 452 (post-amendment version of § 697.07 not intended to alter the common law approach to rights allocation). Indeed, this was the holding of the Florida appellate court in the state court litigation between Citation and Ormond Beach. See Ormond Beach, 634 So.2d at 1092. Under this authority, the Ormond-in-the-Pines net rents from 1989 to 1992 belonged to Ormond Beach, which could freely dispose of them until the 1992 Deposit Order was entered.
 
 
 64
 b. The Prohibition on Retroactive Impairment of Vested Rights Under Florida Law
 
 
 65
 Citation responds that, to the contrary, § 697.07 by its plain language worked a departure from the lien-theory approach. Specifically, Citation relies on language in §697.07(3) stating that, upon default and written demand, the mortgagor "shall" turn over rents to the mortgagee. From this Citation concludes that a defaulting mortgagor necessarily is divested of its possessory rights -- if not title -- upon default and demand, without need for further judicial action. This view is not without support, although the decisions so holding turn at least in part on language contained only in the original version of §697.07, language deleted from the statute in 1993.[2] See, e.g., In re Ameriswiss Assocs., 148 B.R. 349, 352 (Bankr. S.D. Fla. 1992); In re 163rd Street Mini Storage, Inc., 113 B.R. 87, 89-90 (Bankr. S.D. Fla. 1990). Even if Citation is correct, however, Ormond Beach's default and Citation's demand (which we assume for these purposes it effectively conveyed to Ormond Beach through the RTC's November 1989 motion in the Southmark bankruptcy proceedings) did not give Citation a possessory interest in the rent Ormond Beach collected prior to the June 1992 Deposit Order.
 
 
 66
 If §697.07 worked the change in the law that Citation says it did, the rights and duties of parties to the collateral assignment of rents were drastically altered by its enactment. Before the 1987 enactment of §697.07, according to this view of the statute, a creditor could obtain rents under a collateral assignment only by judicial determination that it was entitled to them. Pending such determination, the debtor had the right generally to dispose of the rents collaterally assigned as it saw fit. After the enactment of §697.07, according to this interpretation, the ability of creditors to obtain an interest in rents collaterally assigned and to deprive debtors of their use was considerably enhanced at debtors' expense. All that is now required is default and notice, without the need for judicial intervention.
 
 
 67
 The statute as so interpreted cannot be applied to Ormond Beach and the 1983 collateral assignment of rents because the collateral assignment of rents here predated by four years the earliest version of § 697.07. Under Florida law, a legislative enactment may not be applied retroactively if doing so "would impair rights vested prior to the enactment, create new obligations for the parties in a pre-existing legal relationship, or impose new penalties on conduct which occurred before the enactment." In re Camelot Assocs. L.P., 102 B.R. 161, 166 (Bankr. D. Minn. 1989) (citing State v. Lavazzoli, 434 So.2d 321, 323 (Fla. 1983); Village of El Portal v. City of Miami Shores, 362 So.2d 275, 277 (Fla. 1978); Fleeman v. Case, 342 So.2d 815, 818 (Fla. 1977); Senfeld v. Bank of Nova Scotia Trust Co., 450 So.2d 1157, 1164-65 (Fla. Dist. Ct. App. 1984)); cf. McCord v. Smith, 43 So.2d 704, 708-09 (Fla. 1950) ("A retrospective provision of a legislative act is not necessarily invalid. It is so only in those cases wherein vested rights are adversely affected or destroyed or when a new obligation or duty is created or imposed, or an additional disability is established, in connection with transactions or considerations previously had or expiated."). The statute as read by Citation would "impair rights [of Ormond Beach] vested prior to . . . the enactment [of §697.07 and] create new obligations for [Ormond Beach] in a pre-existing legal relationship." If we were to adhere to Citation's interpretation, therefore, §697.07 could not be applied retroactively to the 1983 collateral assignment of rents. See In re River Oaks Inv. Corp., 152 B.R. 684, 686 (Bankr. S.D. Fla. 1993) (adopting view that right of possession transfers to mortgagee upon default and demand, but concluding that retroactive application of the statute would be impermissible because the Florida constitution bars retroactive alteration of substantive rights); In re Ameriswiss, 148 B.R. at 353 (same); In re Thymewood Apartments, Ltd., 129 B.R. 505, 512 (Bankr. S.D. Ohio 1991) (same); In re Camelot Assocs. L.P., 102 B.R. at 165-66 (same).[3]
 
 
 68
 Since §697.07 thus interpreted cannot be applied to agreements antedating its enactment, the Florida common law rule continues to apply to the 1983 collateral assignment of rents and Ormond Beach was at liberty to disperse the net rents as it saw fit absent voluntary transfer and prior to judicial intervention. Accordingly, Ormond Beach breached no duty under §697.07 regardless of which parties' construction of the statute is accepted. The court below therefore did not err in rejecting Citation's §697.07 claim.
 
 
 69
 In sum, then, Ormond Beach's view is that § 697.07 gives rise to no duty to preserve rents unless and until a creditor obtains judicial intervention in the form of an order of sequestration, foreclosure, or the appointment of a receiver -- something that did not happen in this case until July 1992. If this is correct, Citation's claim of damages for failure to preserve the net rents collected before July 1992 plainly fails. But if this interpretation of the statute is wrong and -- as Citation contends -- §697.07 imposes a duty to preserve and deliver the rents without court action, merely upon default and effective demand, Citation's claim still fails because the statute as thus read could not be applied retroactively to the assignment of rents here in issue.
 
 2. Damages under §697.07
 
 70
 Citation's claim also fails for the additional reason that § 697.07 does not give rise to a cause of action for damages.
 
 
 71
 Citation does not assert here that it is entitled by operation of §697.07's sequestration and foreclosure provisions to have turned over to it 1989-1992 rent proceeds from the Ormond-in-the-Pines facilities that may be in Ormond Beach's possession. Instead, Citation's §697.07 assertion is that the statute accords it a cause of action for damages to compensate it for the loss of the net rent from Ormond-in-the-Pines for the period from November 1989 through June 1992 that ought to have been sequestered and paid to Citation. As Citation puts it, "Damages should be awarded to compensate [it] for the wrongful acts of [Ormond Beach] which resulted in a diminution of the total value of the collateral."
 
 
 72
 Whether or not § 697.07 altered pre-existing possessory rights, as discussed in section I.A.1. above, or may properly be characterized as procedural or substantive, Citation offers no basis nor can we find one ourselves upon which to conclude that the statute created a cause of action for damages. To assert a damages claim in connection with an alleged default on a collateral assignment of rent, therefore, a creditor must have a basis for the claim. For example, a creditor could in appropriate circumstances claim damages resulting from a debtor's conversion, invoking § 697.07 for purposes of establishing the creditor's right to the rents. See, e.g., Ginsberg, 645 So.2d at 499. Section 697.07, standing alone, does not afford such relief.
 
 B. Section 818.01
 
 73
 As a first alternative to reliance upon § 697.07, Citation invokes Fla. Stat. Ann. § 818.01, which makes it a crime to dispose of personal property subject to a lien without the written consent of the lienholder, and § 818.03, which makes it a crime to take such personal property and conceal it or obstruct a lienholder in prosecuting his or her rights in the property. At least one Florida court has concluded that this nominally penal statute gives rise also to a civil cause of action. SeeRosenberg v. Ryder Leasing, Inc., 168 So.2d 678, 679-80 (Fla. Dist. Ct. App. 1964).
 
 
 74
 As the courts below correctly determined, however, rent and collateral assignments of rent do not fall within the scope of §818.01, which applies only to "personal property." In the words of the Supreme Court of Florida, § 818.01
 
 
 75
 tends to stabilize the sale and barter in personal property under lien . . ., and to fix its situs within the knowledge of the lienee or vendor while so burdened. It deals solely with property that is in its very nature perishable, is subject to rapid depreciation in value, is easily secluded, and is readily transported from place to place.
 
 
 76
 State ex rel. Lanz v. Dowling, 110 So. 522, 524 (Fla. 1926) (emphasis added). Aside from transportability, these are hardly the hallmarks of rent. Not surprisingly, as far as we have been able to determine no court has ever applied this statute to rent. Rent and collateral assignments of rent are traditionally considered not personal property but real property interests. See, e.g., Matter of Wheaton Oaks Office Partners, Ltd., Partnership, 27 F.3d 1234, 1241 (7th Cir. 1994) ("Assignments of rents are interests in real property."); In re Spanno, 161 B.R. 880, 885 (Bankr. D. Conn. 1993). The courts below therefore did not err in determining that Citation's invocation of § 818.01 fails. The claim under § 818.03, which also applies to personal property, fails for the same reason.
 
 C. Section 726.105
 
 77
 Citation's final basis for seeking damages for the lost net rent is Fla. Stat. Ann. §726.105, Florida's version of the Uniform Fraudulent Transfer Act. In substance, § 726.105 prohibits a debtor from transferring property with the actual intent to hinder, delay, or defraud a creditor. In order to establish a fraudulent transfer claim, however, "a creditor must have at least one claim in existence when the transfers were made." Harper v. United States, 769 F. Supp. 362, 366-67 (M.D. Fla. 1991) (citing Whetstone v. Coslick, 157 So. 666, 667 (Fla. 1934)). As discussed above in the context of the § 697.07 cause of action, Citation has no such claim as a result of the RTC's November 1989 demand on Southmark. Consequently, Ormond Beach's disposition of the back rent for the period from November 1989 through June 1992 cannot form the basis of a fraudulent transfer claim under § 726.105. We affirm the decision of the court below on this basis. It is therefore unnecessary to consider the lower courts' alternative bases for rejecting application of §726.105: (1) Citation's failure to establish fraudulent intent, and (2) the unavailability of damages under §726.108, the statute setting forth the remedies for violation of § 726.105.
 
 II. Recovery of the Deficiency
 
 78
 In addition to seeking damages for dissipated rents, Citation, having recovered only about a third of the debt on the 1983 mortgage by foreclosing on the Ormond-in-the-Pines facilities, seeks to extract the deficiency from Ormond Beach's bankruptcy estate. In support of its asserted right to do so, Citation argues that Ormond Beach is liable to it for the deficiency because (1) the 1983 mortgage contains a covenant to pay the mortgage debt and (2) Ormond Beach violated the 1983 mortgage's due-on-sale clause. The bankruptcy court rejected both arguments, and the district court affirmed. So do we.
 
 
 79
 Ormond Beach did not assume the 1983 mortgage when it acquired Ormond-in-the-Pines from RCofA III in 1986. The 1986 note explicitly states that Ormond Beach "is not purchasing the Project 'subject to' or 'in assumption of' the Prior Liens or the indebtedness secured thereby." In the same vein, the 1986 wrap-around mortgage emphasized RCofA III's continuing obligation to make payments to Freedom in fulfillment of its obligations under the 1983 mortgage. As a result of these arrangements, while Ormond Beach did take subject to the risk that RCofA III would default, permitting Freedom or its successors to foreclose upon the retirement center in satisfaction of the 1983 mortgage, it did not assume the terms of the 1983 mortgage itself and has no other obligation to pay the 1983 note. See Kendall House Apartments, Inc. v. Department of Revenue, 245 So.2d 221, 223 (Fla. 1971) (one who takes "subject to" mortgage, in contrast to one who "assumes" mortgage, has no personal liability); Yates v. St. Johns Beach Development Co., 176 So. 422, 423 (Fla. 1937) (same); Alabama-Florida Co. v. Mays, 149 So. 61, 63 (Fla. 1933) (same); Jackson v. Aripeka Sawmills, 43 So. 601 (Fla. 1907) (same). Citation responds by suggesting that the covenant to pay, as part of a recorded mortgage, runs with the land. It does not, however, since the covenant plainly does not touch and concern the land. See Caulk v. Orange County, 661 So.2d 932, 934 (Fla. Dist. Ct. App. 1995) (explaining that a "covenant must have a relation to the land or the interest conveyed in order that a covenant may run with the land."). We therefore conclude that the courts below properly rejected Citation's attempt to bind Ormond Beach to the 1983 mortgage's covenant to pay.
 
 
 80
 Citation's reliance on the due-on-sale clause of the 1983 mortgage fares no better. No doubt RCofA III was bound by that clause, and violated it in the course of secretly transferring title to Ormond Beach in 1986. Ormond Beach, however, did not breach that provision because it never became bound by it. Nor did Ormond Beach become bound by it in the wake of the 1986 transfer of the Ormond-in-the-Pines facilities, because, like the covenant to pay, the due-on-sale clause does not run with the land. Furthermore, we have found no authority for holding a grantee liable under a due-on-sale clause in the grantor's mortgage. We therefore find no error in the decision of the court below.
 
 CONCLUSION
 
 81
 For the foregoing reasons, we affirm the decision of the district court affirming that of the bankruptcy court. In doing so, we have no need to certify any question of law to the Florida Supreme Court pursuant to § 0.27 of the Second Circuit Local Rules, Florida Constitution Art. V, § 3(b)(6) and Fla. R. App. P. 9.030(a)(2)(C), and we therefore deny appellants' motion asking us to do so.
 
 APPENDIX
 Fla. Stat. § 697.07 (1998)
 
 82
 Assignment of rents.
 
 
 83
 (1) A mortgage or separate instrument may provide for an assignment of rents of real property or any interest therein as security for repayment of an indebtedness.
 
 
 84
 (2) If such an assignment is made, the mortgagee shall hold a lien on the rents, and the lien created by the assignment shall be perfected and effective against third parties upon recordation of the mortgage or separate instrument in the public records of the county in which the real property is located, according to law.
 
 
 85
 (3) Unless otherwise agreed to in writing by the mortgagee and mortgagor, the assignment of rents shall be enforceable upon the mortgagor's default and written demand for the rents made by the mortgagee to the mortgagor, whereupon the mortgagor shall turn over all rents in the possession of the mortgagor at the time of the written demand or collected thereafter (the "collected rents") to the mortgagee less payment of any expenses authorized by the mortgagee in writing.
 
 
 86
 (4) Upon application by the mortgagee or mortgagor, in a foreclosure action, and notwithstanding any asserted defenses or counterclaims of the mortgagor, a court of competent jurisdiction, pending final adjudication of any action, may require the mortgagor to deposit the collected rents into the registry of the court, or in such other depository as the court may designate. However, the court may authorize the use of the collected rents, before deposit into the registry of the court or other depository, to:
 
 
 87
 (a) Pay the reasonable expenses solely to protect, preserve, and operate the real property, including, without limitation, real estate taxes and insurance;
 
 
 88
 (b) Escrow sums required by the mortgagor or separate assignment-of-rents instrument; and
 
 
 89
 (c) Make payments to the mortgagee.
 
 
 90
 The court shall require the mortgagor to account to the court and the mortgagee for the receipt and use of the collected rents and may also impose other conditions on the mortgagor's use of the collected rents.
 
 
 91
 (5) Nothing herein shall preclude the court from granting any other appropriate relief regarding the collected rents pending final adjudication of the action. The undisbursed collected rents remaining in the possession of the mortgagor or in the registry of the court, or in such other depository as ordered by the court, shall be disbursed at the conclusion of the action in accordance with the court's final judgment or decree.
 
 
 92
 (6) The court shall expedite the hearing on the application by the mortgagee or mortgagor to enforce its assignment of rents. The procedures authorized by this statute are in addition to any other rights or remedies of the mortgagee or mortgagor under the mortgage, separate assignment-of-rents instrument, promissory note, at law, or in equity.
 
 
 93
 (7) Nothing herein shall alter the lien priorities, rights, or interests among mortgagees or other lienholders or alter the rights of the mortgagee under the mortgage, separate assignment-of-rents instrument, at law or in equity, concerning rents collected before the written demand by the mortgagee. A mortgagee's enforcement of its assignments of rents under this statute shall not operate to transfer title to any rents not received by the mortgagee.
 
 
 94
 (8) Any moneys received by the mortgagee pursuant to this statute shall be applied by the mortgagee in accordance with the mortgage, separate assignment-of-rents instrument, or promissory note, and the mortgagee shall account to the mortgagor for such application.
 
 
 
 Notes:
 
 
 *
 Hon. Sidney H. Stein, of the United States District Court for the Southern District of New York, sitting by designation.
 
 
 [1]
 Although both RCofA I and RCofA III were mortgagees and payees under the 1986 note and wrap-around mortgage in favor of Ormond Beach, the issues on appeal appear to concern only obligations derived from RCofA III's original 1983 arrangement with Freedom. Accordingly, we refer hereinafter exclusively to RCofA III's obligations.
 
 
 [2]
 Prior to the 1993 amendment, the statute provided that "such assignment [of rents] shall be absolute upon the mortgagor's default, becoming operative upon written demand made by the mortgagee." Fla. Stat. Ann. § 697.07 (1987).
 
 
 [3]
 To be sure, there is authority for the proposition that § 697.07 may be applied retroactively. But courts reaching this conclusion have done so only by concluding, in accordance with Ormond Beach's view, that § 697.07 is but a procedural statute working no change in the substantive rights of the parties. See, e.g., In re Ormond Beach, 204 B.R. at 347-48; In re Aloma Square, Inc., 116 B.R. 827, 289 (M.D. Fla. 1990); Ginsberg, 645 So.2d at 496-97. If the statute is merely procedural, then it may be applied retroactively, but that is of no benefit to Citation. In that case, Citation's entitlement to rents did not arise until 1992 when the Florida court entered its first order requiring the sequestration by Ormond Beach of the Ormond-in-the-Pines rents.